STEPHENS, J.
This criminal appeal arises from the Fourth Judicial District Court, Ouachita Parish, State of Louisiana. Following a bench trial, the defendant, Michael Barnett, Jr., was found guilty as charged of second degree murder and sentenced to life imprisonment without benefit of probation, parole, or suspension of sentence, pursuant to La. R.S. 14:30.1. Barnett now appeals his conviction and sentence, which we affirm for the following reasons.
FACTS AND PROCEDURAL HISTORY
In the early hours of December 20, 2011, Deputies Seth Cox and Michael McLain, of the Ouachita Parish Sheriff's Department ("OPSD"), responded to a 911 call about a shooting on Dellwood Drive in Monroe, Louisiana. They found a deceased black male in a black shirt and dark jeans with multiple gunshot wounds lying at the edge of a ditch on Dellwood Drive. The deceased was later identified as Andre Alexander. Michael Barnett, Jr., was subsequently arrested and charged with second degree murder, in violation of La. R.S. 14:30.1.
Barnett was indicted for second degree murder on February 9, 2012. As of March 23, 2015, the matter had not yet proceeded to trial, and Barnett filed a pro se motion to quash the indictment based on La. C. Cr. P. art. 578(A)(2), which provides that no trial shall be commenced in a non-capital felony case after two years from the date of institution of the prosecution. In response, the state urged the applicability of La. C. Cr. P. art. 580(A), which *480 addresses suspension of time limitations. Following a brief hearing, the trial court granted the motion quashing the indictment. The court then granted a stay of the proceedings and the state filed a writ application with this court, which was granted. The matter was considered an appealable issue. State v. Barnett , 50,159-KW (La. App. 2 Cir. 04/16/2015). Ultimately, this court concluded that the running of the two-year time limitation of La. C. Cr. P. art. 578 was suspended by the defense motion for preliminary examination and thereafter by numerous continuances of the trial date, and the trial judge abused his discretion in finding otherwise and in granting the motion to quash. The judgment was vacated, and the motion to quash the indictment filed by Barnett was denied. The matter was remanded for further proceedings. State v. Barnett , 50,213 (La. App. 2 Cir. 08/12/15), 174 So.3d 748.
Barnett waived his right to a jury trial, and a bench trial began on August 15, 2016. The state announced for the record that Barnett rejected the state's offer for him to plead guilty to manslaughter with a sentencing range of 25-35 years.
On August 23, 2016, Barnett appeared for the trial court's verdict. The trial court explained that after weighing the physical and testimonial evidence presented by the state at trial, it found that Barnett shot and killed Andre Alexander. The trial court found that specific intent to kill was established by the findings made in the report of Alexander's autopsy, which revealed that Alexander was shot five times, including once in the head. Barnett was found guilty as charged of second degree murder.
On November 9, 2016, Barnett filed a post-trial motion for new trial and a motion to reconsider the verdict and/or for a directed verdict of acquittal.[1] The trial court denied the motions for new trial and for a directed verdict of acquittal, but granted the motion to reconsider the verdict. Resultantly, the trial court vacated its ruling finding Barnett guilty of second degree murder and entered a ruling of guilty of the responsive verdict of manslaughter. In response, the state filed a writ application to this court; we granted the state's writ, vacated the verdict of manslaughter, reinstated the conviction for second degree murder, and remanded the matter for sentencing. State v. Barnett , 51,493-KW (La. App. 2 Cir. 04/04/2017), writ denied , 2017-0946 (La. 09/29/17), 227 So.3d 290.
Back in the trial court (and prior to sentencing), Barnett then filed a pro se "motion to reconsider new trial," which the trial court granted after finding that the verdict of second degree murder was contrary to the law and evidence. The state sought to appeal the trial court's ruling, which the trial court denied. Thus, the state sought supervisory review of the trial court's denial of its motion for appeal, which we denied on the basis that the ruling granting a new trial was not a final appealable judgment. State v. Barnett , 52,121-KW (La. App. 2 Cir. 02/08/2018). Ultimately, the state applied for supervisory review of the trial court's ruling granting Barnett a new trial; this writ was granted, the ruling reversed, the conviction for second degree murder reinstated, and the matter remanded for sentencing. State v. Barnett , 52,156-KW (La. App. 2 Cir. 03/08/2018).
*481 Barnett appeared for sentencing on April 2, 2018. The trial court imposed the mandatory sentence of life imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence. Barnett was advised of the time delays to appeal his conviction and sentence and to seek post-conviction relief, and he filed a motion to reconsider sentence. The motion was denied, and this appeal by Barnett ensued.
DISCUSSION
In his one and only assignment of error, Barnett argues there was insufficient evidence to support the conviction for second degree murder. Barnett asserts that the state did not establish beyond a reasonable doubt that he was Andre's shooter. Barnett also argues that the state failed to prove that he wrote or sent the inculpatory text messages that Chereteria Kennedy alleged were from him. Barnett maintains that no eyewitnesses specifically identified him as the shooter and asserts that witness testimony regarding inculpatory acts and statements allegedly made by Barnett were contradictory and insufficient to establish beyond a reasonable doubt that he was the shooter.
Barnett notes that in testimony by those witnesses who saw and identified him at the scene or in the hours after the murder, none of those witnesses saw him with a gun. He also emphasizes that while Arthur Mott testified that the man he saw chasing the victim on Dellwood Drive was carrying a gun, Mott could not identify the gunman. Barnett dismisses the entirety of Mott's testimony as noncredible because Mott assumed that the unknown gunman was wearing shorts since Mott could see the gunman's socks, while none of the other witnesses said Barnett was wearing shorts.
Barnett further argues that the state provided no physical or forensic evidence tying him specifically to Andre's murder. Barnett asserts that he is innocent because no gun was recovered; Andre suffered five gunshot wounds but only two shell casings were recovered; forensic testing of the vehicle Barnett rode in before and after the homicide revealed no evidence tying him to the murder; and, in the security video of Barnett at the gas station after the murder, there was no visible blood on his shirt, pants, or shoes. We disagree.
Legal Principles
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia , 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) ; State v. Tate , 2001-1658 (La. 05/20/03), 851 So.2d 921, cert. denied , 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004) ; State v. Bass , 51,411 (La. App. 2 Cir. 06/21/17), 223 So.3d 1242, writ not cons. , 2018-0296 (La. 04/16/18), 239 So.3d 830. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford , 2005-0477 (La. 02/22/06), 922 So.2d 517 ; State v. Dotie , 43,819 (La. App. 2 Cir. 01/14/09), 1 So.3d 833, writ denied , 2009-0310 (La. 11/06/09), 21 So.3d 297.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient *482 for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton , 436 So.2d 471 (La. 1983) ; State v. Norman , 51,258 (La. App. 2 Cir. 05/17/17), 222 So.3d 96, writ denied , 2017-1152 (La. 04/20/18), 240 So.3d 926
Direct evidence provides proof of the existence of a fact, for example, a witness's testimony that he saw or heard something. State v. Lilly , 468 So.2d 1154 (La. 1985) ; State v. Baker , 49,175 (La. App. 2 Cir. 08/27/14), 148 So.3d 217. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Broome , 49,004 (La. App. 2 Cir. 04/09/14), 136 So.3d 979, writ denied , 2014-0990 (La. 01/16/15), 157 So.3d 1127. For a case resting essentially upon circumstantial evidence, that evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438 ; State v. Christopher , 50,943 (La. App. 2 Cir. 11/16/16), 209 So.3d 255, writ denied , 2016-2187 (La. 09/06/17), 224 So.3d 985.
The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith , 1994-3116 (La. 10/16/95), 661 So.2d 442 ; State v. Walker , 51,217 (La. App. 2 Cir. 05/17/17), 221 So.3d 951, writ denied , 2017-1101 (La. 06/01/18), 243 So.3d 1064. Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Ward , 50,872 (La. App. 2 Cir. 11/16/16), 209 So.3d 228, writ denied , 2017-0164 (La. 09/22/17), 227 So.3d 827. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Hust , 51,015 (La. App. 2 Cir. 01/11/17), 214 So.3d 174, writ denied , 2017-0352 (La. 11/17/17), 229 So.3d 928. The trier of fact is charged to make a credibility evaluation and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Sosa , 2005-0213 (La. 01/19/06), 921 So.2d 94 ; State v. Hust, supra .
A reviewing court accords great deference to a fact finder's decision to accept or reject the testimony of a witness in whole or in part. State v. Brown , 51,352 (La. App. 2 Cir. 05/02/17), 223 So.3d 88, writ denied , 2017-1154 (La. 05/11/18), 241 So.3d 1013.
In 2011 (the year of the offense), La. R.S. 14:30.1 defined second degree murder, in pertinent part, as the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, assault by drive-by shooting, armed robbery, first degree robbery, second degree robbery, simple robbery, cruelty to juveniles, second degree cruelty to juveniles, or terrorism, even though he has no intent to kill or to inflict great bodily harm.
Specific intent is that state of mind that exists when the circumstances indicate the offender actively desired the proscribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1).
*483 As a state of mind, specific intent need not be proven as a fact, but may be inferred from the circumstances of the offense and the defendant's actions. State v. Allen , 41,548 (La. App. 2 Cir. 11/15/06), 942 So.2d 1244, writ denied , 2007-0530 (La. 12/07/07), 969 So.2d 619. All that is necessary is that the defendant form the specific intent to kill or inflict great bodily harm for an instant when committing the crime. State v. Williamson , 27,871 (La. App. 2 Cir. 04/03/96), 671 So.2d 1208, writ denied , 1996-1143 (La. 10/04/96), 679 So.2d 1380.
Specific intent may be inferred from the circumstances of the offense and the defendant's act of deliberately pointing a gun and firing it at a person. State v. Patterson , 50,305 (La. App. 2 Cir. 11/18/15), 184 So.3d 739, writ denied , 2015-2333 (La. 03/24/16), 190 So.3d 1190.
Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. La. R.S. 14:30.1(B).
Trial Testimony and Evidence
Deputy Craig Hamby, the lead investigator with the OPSD, testified that he responded to Dellwood Drive and was approached by Arthur Mott, who was an eyewitness to the offense. Officers also found witnesses LaSheva Murrell, who lived on Dellwood Drive, and her cousin, Terrany Williams, who was in Murrell's driveway at the time of the offense. The investigation led officers one street over to a house on Tanglewood Drive, where they found witnesses Phyllis Alexander and Roshun Alexander. After interviewing these witnesses, Deputy Hamby and Deputy Reginald Smith discerned that the incident began outside Phyllis Alexander's house at 606 Tanglewood Drive, where the victim was last seen alive, and expanded to Dellwood Drive, where Andre was found dead in the ditch, just yards from the Murrell home.
Deputies Daryl Johns and Johnny Holyfield, both of the OPSD, testified that they photographed both crime scenes and collected evidence. The officers found two 9 mm shell casings and one 9 mm live bullet on the ground outside of Phyllis Alexander's home. The officers traced a blood trail on the ground near the side of the Alexander house, through the backyard, through a downed section of fencing into the adjacent backyard at 207 Dellwood Drive, and alongside that house to the street. Officers also found blood on Terrany Williams's vehicle, which had been parked in Murrell's driveway at 203 Dellwood Drive, near the location of Andre's body. No gun was recovered. During the investigation of the crime, forensic testing was performed of the vehicle Barnett was seen driving; however, this did not reveal any evidence tying Barnett to the homicide.
Terrany Williams testified she witnessed an altercation on December 20, 2011. According to Williams, she had just dropped off her cousin at LaSheva Murrell's house and was still sitting in her silvery gray sedan in the driveway checking her cell phone when she heard a sound. She recalled a street lamp lit the area, as well as a porch light from Murrell's house. Williams testified that she saw a black male, wearing a black shirt and dark jeans, who was bleeding from the stomach area-he bumped into her car. Williams testified that this man was being chased by a second black male, whom she recognized as her former schoolmate, Michael Barnett. Williams said the two ran around her car and continued on. Williams backed out of the driveway and saw Barnett standing over the other male, who was lying on the ground. It appeared to her that Barnett punched the man lying on the ground.
*484 Williams then drove down the street to a nearby store and used her cell phone to call Murrell.
LaSheva Murrell testified that on December 20, 2011, she was at home at 203 Dellwood Drive, and she was asleep when she was awakened by the sound of "about" three gunshots. Murrell's niece had just been dropped off at the home by Murrell's cousin, Terrany Williams. Then Murrell received a phone call from Williams, who warned her to look outside for a body in the ditch in front of her house. Murrell looked outside, saw the body, and called 911.
Arthur Mott testified that he was driving down Dellwood Drive on December 20, 2011, when suddenly two black males ran out in front of him, causing him to slam on his brakes. Mott had his vehicle lights on high beam and there were street and porch lights in the vicinity; however, he did not recognize either man. He did recall that one man was wearing a black shirt and gray sweatpants, while the man chasing him wore a blue shirt with a white shirt underneath it. Mott testified that he could see the second man was wearing white socks, so he thought that the man had on shorts. Mott testified that the man held his pants in his left hand and a gun in his right hand-he was sure it was a gun by the way it was clutched. Mott said the two men came from the direction of a trail that Mott knew ran from Tanglewood Drive to Dellwood Drive. Mott testified that after running in front of him, the two men continued running down Dellwood Drive and into a yard with a white car parked in the driveway. Mott testified that the car's lights were on and someone was sitting inside. Mott testified that he drove past the house where the car was parked and stopped in front of the daycare next door, and looked over his shoulder. Mott testified that he saw the first man fall to the ground, and then he saw the second man shoot the man on the ground. Again, he testified that the area was well lit. Mott then saw the white vehicle back out of the driveway and drive past him. Mott reiterated that he heard at least three gunshots and was certain that the second man carried what Mott believed to be a gun. Mott said he saw the gunman turn and run away in the direction he had come.
Phyllis Alexander testified that on December 20, 2011, she lived at 606 Tanglewood Drive, and Andre Alexander was her nephew. That night (after midnight), she had been asleep on the couch when she heard her son, Roshun Alexander, open the front door. She stood behind Roshun and saw Andre and Michael Barnett, whom she had known for years. Phyllis saw both Andre's burgundy car and a silver Chrysler 300, which she knew belonged to Barnett's mother, Natasha Mays, parked out front. Phyllis testified that she thought there were two women inside Barnett's car.
Phyllis heard Barnett ask Roshun about her other son, and she told Barnett that he was asleep. Roshun closed the door and they both went back inside; Phyllis went back to lie down on the sofa. A few minutes later Phyllis heard multiple gunshots, which she thought came from the street behind her, Dellwood Drive. Looking outside, Phyllis saw Barnett get into the front passenger side of his vehicle and leave. Phyllis testified that Barnett was wearing a blue shirt. Phyllis testified that she did not see her nephew, so she and Roshun began looking for him. They followed the trail that ran from her backyard, through the rear fence into the backyard of another house on Dellwood Drive. As they advanced down Dellwood Drive, they were stopped by law enforcement officers. Phyllis testified that she could see a body lying on the side of the street by the ditch and *485 recognizing the clothing, she knew it was Andre.
Roshun Alexander testified that on December 20, 2011, he was living with his mother at her home at 606 Tanglewood Drive. In the middle of the night, his cousin Andre knocked on his window. Roshun dressed and opened the front door to find Andre, who wore a black shirt and jeans, and Michael Barnett, who wore a light blue shirt. Roshun saw both Andre's burgundy vehicle and a silver Chrysler 300 that he knew belonged to Barnett's mother. Roshun testified that he could see there was someone sitting in Barnett's vehicle, but could not see who it was. Roshun testified that Barnett asked about Roshun's brother. Roshun said he did not know where his brother was. He thought both men were acting normally. Roshun closed the door and returned to bed. He later heard gunshots outside. Roshun looked outside, but did not see his cousin or Barnett, just someone sitting in Barnett's vehicle. Roshun then saw Barnett "jogging" down the street, and it appeared he was trying to hold his pants up or hide something in his pants. Roshun testified that he thought Barnett might be hiding a gun, but said he did not actually see a gun. Roshun watched Barnett get into the passenger side of his vehicle and leave.
Roshun testified that he could not reach Andre on his cell phone so he, his mother, his girlfriend, and his cousin began searching for Andre. They searched the trail leading from their house to the street behind them (i.e. , Dellwood Drive) and were stopped by law enforcement officers.
Moneice Mitchell testified that she is Barnett's first cousin and characterized them as having a close relationship. According to Mitchell, in the early morning of December 20, 2011, she got in a vehicle with Barnett, a Chrysler 300 owned by Barnett's mother, Natasha Mays. Barnett was driving, and they were the only two in the vehicle. Mitchell testified that Barnett began following a burgundy vehicle, and Barnett kept pressing the car horn signaling for the driver to stop.
Mitchell said they followed the vehicle into the Tanglewood residential area and stopped behind the vehicle at a house. Mitchell testified that both Barnett and the driver of the car got out. Mitchell said she did not know the name of the other man at the time, but she later learned his name was Andre Alexander. Mitchell testified that she remained in the car while Barnett and Andre talked in the front yard, about 35-45 minutes. They appeared calm. At one point, she saw Barnett talking to someone in the house and heard him ask for someone but a voice replied that the person was asleep. Mitchell stated that Barnett returned to the vehicle.
Mitchell testified that Barnett began to drive off, but suddenly put the car in park, jumped out, and ran after Andre, who ran but was followed by Barnett. She was "looking" and she saw the duo run toward the side of a house. Mitchell testified that she moved to the driver seat and moved the car out of the road-she waited but could not see anything because it was dark. Then she heard three or four gunshots and "everybody" started to come out of the house. According to Mitchell, Barnett returned to the car, got into the front passenger seat, and told her to leave. Barnett was sweating and "out of breath." He was angry and yelling at Mitchell, who was concerned for her safety. Mitchell said she was unfamiliar with the area and was not sure where to go, so she was driving slowly. Mitchell testified that Barnett pushed his foot down on the accelerator and grabbed the steering wheel, as they drove to Barnett's mother's house. Mitchell testified that Barnett called someone on his cell phone. She heard him tell the person that *486 he loved her and his family and he killed "Dre." Mitchell testified that after they reached the house, Barnett took off on foot. Mitchell stated that Barnett's sister, Lametris, knew Andre and insisted that she wanted to help him, so Mitchell and Lametris drove back to the location on Dellwood where Andre was shot. The police came, and Mitchell made a statement to them. She made a second, more detailed statement ten days later. Mitchell testified that she never saw Barnett with a gun that night, but recalled that the he was wearing a blue shirt with a white shirt underneath it and jeans.
Jarrell Bush testified that he and Barnett attended high school together. Bush testified that on December 20, 2011, he was at his home playing video games with his friend, James Harris. Sometime between 4:00 and 5:00 p.m, Barnett appeared at Bush's house, told Bush that he was in trouble, and asked to use a phone. Barnett used Harris's cell phone outside of the room where Bush and Harris were playing. Barnett returned to the room, chatted with Harris, and then the phone rang. Harris answered it and then told Bush that Barnett needed to leave. Following directions from Barnett, Bush and Harris drove Barnett to an unknown address off Pearl Street. Bush and Harris returned to Bush's house and continued playing games until the police arrived, looking for Barnett. Bush told police that Barnett was wearing a blue shirt with a white shirt underneath and that Barnett's appearance led Bush to tell investigating officers that he believed that Barnett had been fighting.
James Harris testified that he also knew Barnett from high school. He described the same series of events with Barnett as did Bush. Harris then recounted the statement he made to police regarding his conversation with Barnett, regarding Barnett's incident with another man whom he pistol-whipped and shot in the head. Harris confirmed at trial that he told officers that Barnett was wearing a blue shirt with a white undershirt.
Kelsey Haskins testified that he called law enforcement officers after he learned that he was being sought in connection with the shooting investigation. Haskins testified that at approximately 1:00 a.m. on December 20, 2011, he stopped for gas at a gas station on Highway 165 North when he saw Barnett. Haskins knew Barnett because Barnett used to date his girlfriend's niece, Keyarra Cobbler. Haskins testified that Barnett approached him and asked him for a ride to Bastrop, even offering to pay for gas. Two other men were already with Haskins and together with Barnett, they all rode off in Haskins's vehicle, with Barnett sitting in the back.
Haskins testified that Barnett announced to the group that they were riding with a murderer; however, Haskins did not believe Barnett. According to Haskins, Barnett instructed him to turn on the vehicle's interior lights, and Haskins testified that he turned and looked at Barnett, seeing "some blood on his pants." Haskins stated that Barnett said that somebody tried to "play him" over some speakers, that he "got into it" with the man, and then shot the man, who was now dead. Haskins testified that Barnett specifically said that the man was holding his stomach and that Barnett shot the man in the head. Haskins viewed State's Exhibit 9, a picture of Barnett taken from the security video at the gas station, which showed Barnett wearing a light blue shirt with a white shirt underneath it. Haskins confirmed that Barnett's appearance that night matched his appearance in the picture. Haskins testified that he never saw Barnett with a gun that night.
Haskins testified that as he dropped Barnett off, Barnett handed him a set of *487 keys to give to Keyarra Cobbler. Haskins testified that he gave the keys to his girlfriend, Latedra Shaw. Shaw testified that she gave the keys to her niece, Keyarra Cobbler. Cobbler testified that she called Natasha Mays, Barnett's mother, about the keys and Mays sent her brother to pick them up from Cobbler.
Cherteria Kennedy testified that in December 2011, she was working as a dispatcher at the Rayville Police Department. Kennedy testified that she met Barnett through the police department about two months before the shooting, he sometimes stopped by the department to see her, and they texted each other. Kennedy testified that on the evening of December 19, 2011, she received a series of texts from the cell phone number that she had stored in her phone for Barnett and from which she had received his prior text messages. Kennedy could not recall the cell phone number. Kennedy testified that she did not speak to Barnett on the phone that night.
Kennedy related that the police contacted her the afternoon after the incident, and she gave them her cell phone. The state presented its Exhibit 7, which were copies of text messages that were obtained by law enforcement purportedly between Kennedy and Barnett on the evening of December 19. Kennedy was asked to identify the exhibit, which she did. The texts stated that someone owed the sender money; the sender would kill the individual if he had his gun; the individual was mad at the sender for beating up the individual's cousin; and the cousin had set the sender up. The most incriminating text purporting to be from Barnett was the one relayed on December 19 at 8:56 p.m.: "Whenever i catch him an i have my gun i will kill him on my bby." The defense objected to the admission of the texts because there was no evidence specifically tying Barnett to the phone number or the texts themselves, as there was no information identifying who wrote and sent the texts. The objection was overruled.
Iyeka Barnes testified that in December 2011, she was living at 2604 Lee Avenue with her daughter and niece, Woodlexis Battle. According to Barnes, on December 21, 2011, she and Battle were walking to the nearby school for a school program when they saw Barnett, whom Barnes had met before at a party. Barnett asked Barnes about a mutual acquaintance named John Boy. Barnes thought John Boy was Barnett's cousin and let Barnett inside her house to wait, purportedly, for John Boy while she and Battle left for a school program. Barnes testified she returned home an hour or two later, and Barnett was still there. Barnes testified that when law enforcement officers arrived asking about Barnett, she told them he was there. Police had her and Battle leave the house while they apprehended Barnett. Barnes testified that she never saw Barnett with a gun that day.
Woodlexis Battle testified that she was Barnes's niece and lived with her in December 2011. She also testified that she knew Barnett. Battle stated that she and Barnes encountered Barnett on December 21 as they were leaving for a school program and let him stay in the house while she and Barnes were gone. She testified that Barnett was still there when they returned and when the officers arrived later.
Officer David Germany of the OPSD testified that "just prior to lunchtime" on December 21, 2011, the department received a CrimeStoppers tip that Barnett was hiding at a house on Lee Avenue. An arrest warrant for Barnett had been issued, so Ofc. Germany, along with Officers Tom Hargrove and Scott Brown, proceeded to the house at 2604 Lee Avenue. Officer *488 Germany testified that the officers knocked and announced themselves repeatedly, and the officers could hear people inside but no one answered. According to Ofc. Germany, a woman named Iyeka Barnes finally answered the door. When the officers asked if Barnett was there, Barnes told the officers that Barnett had been there but had already left. Officer Germany testified that after some hesitation, Barnes gave her consent for the officers to search the residence. Barnes and a second woman, Woodlexis Battle, were detained while officers searched the house.
Officer Germany testified that Barnett was found crouched inside a locked air conditioning return vent in a hallway. Officer Germany recounted that Barnett was a murder suspect, and the officers did not know if he was armed. Officer Germany testified that when Barnett refused the officers' requests to show his hands, Ofc. Germany deployed his Taser for officer safety. Barnett was then arrested. Officers did not find a weapon on Barnett.
Dr. Frank Peretti, a forensic pathologist with the Arkansas State Crime Lab, was accepted as an expert in forensic pathology and testified regarding his autopsy of Andre Alexander. Dr. Peretti testified that Andre sustained five gunshot wounds, but he could not determine the sequence of the gun shots. According to Dr. Peretti, a "straight shot" to the head through his brain was sufficient by itself to have killed Andre. Another shot-through his upper left chest hitting the sternum, the heart, the right lung, and a right posterior rib before exiting the back-was also sufficient by itself to kill the victim. One gunshot wound was found in Alexander's left thigh and another was found in his right forearm, with the latter wound containing a large caliber bullet. Finally, a bullet entering Alexander's upper buttock and exiting above his right pelvis caused a flesh wound and did not injure major organs.
Dr. Peretti testified that all the shots were made from a distance of two feet or more from the victim. Other than an abrasion on one arm, the doctor found no other contusions or lacerations that would suggest the victim had been pistol-whipped.
Analysis
When viewed in the light most favorable to the state, the evidence presented at trial was sufficient to support Barnett's conviction for second degree murder. Although Barnett argues that the evidence purporting to be against him was inconsistent and inconclusive, when weighing the slightly conflicting testimony, we conclude the weight of the evidence supports a finding of Barnett's guilt. The witness testimony was abundant: witnesses saw Barnett and Andre together just prior to Andre's death; witnesses placed Barnett at the scene of the killing; witnesses saw Barnett chasing Andre; witnesses identified Barnett as having a weapon; witnesses saw one man shoot another man; witnesses heard gunshots; witnesses saw a man bleeding; and, witnesses heard Barnett bragging/admitting to the killing.
Testimony by Moneice Mitchell, Roshun Alexander, and Phyllis Alexander all placed Andre Alexander in his burgundy vehicle and Michael Barnett in his mother's Chrysler outside Phyllis Alexander's home on Tanglewood Street in the early morning hours of December 20, just prior to hearing multiple gunshots. Mitchell testified that Barnett followed Andre by car to the house and then chased him on foot around the house. Mitchell, Roshun, and Phyllis all testified that after they heard the gunshots, they saw Barnett return to his vehicle and leave. Mitchell testified that Barrett appeared agitated after returning to the vehicle, so much so that she was concerned for her safety. All three *489 testified that Barnett was wearing a blue shirt.
Law enforcement recovered two spent shell casings and one live bullet at Phyllis Alexander's house and traced a blood trail from the house, through the backyard to the next street over, Dellwood Drive. Arthur Mott and Terrany Williams both testified that they saw one black male chasing another black male on Dellwood Drive that night. Mott testified that the second male was wearing a blue shirt with a white shirt underneath, while Terrany Williams was able to identify the second male as her former schoolmate, Michael Barnett. Williams' testimony directly placed Barnett on Dellwood Drive, chasing the victim, who Williams saw was bleeding, around the same time that gunshots were heard by Mitchell, Roshun and Phyllis Alexander, LaSheva Murrell, and Mott. Immediately thereafter, Williams told Murrell there was a body in front of her house, which was quickly confirmed by Murrell and the responding law enforcement officers. Phyllis Alexander, who had just seen Barnett talking to Andre in her front yard one street over, observed her nephew dead on the ground after hearing gunshots and seeing Barnett abruptly leaving.
Both Mott and Williams saw the victim on the ground with the second male standing over him. Mott testified that he saw Barnett with a gun and saw Barnett shoot the victim as he lay on the ground. Mott's testimony was consistent with the testimony of Mitchell, Harris, and Kelsey Haskins, who also testified that Barnett was wearing a blue shirt with a white shirt underneath that night. Mott's testimony was also consistent with testimony by Mitchell, Harris, and Haskins, that Barnett admitted shooting and killing a man.
Further, Harris and Haskins both testified that Barnett admitted shooting and killing a man that he had been chasing because the man owed him money for speakers. This testimony was consistent with the text messages that Chereteria Kennedy testified were sent to her earlier that night from the phone number she had for Barnett, in which the sender announced he had been chasing someone who owed him money and whom the sender would shoot and kill with a gun.
Finally, as noted by the trial court, evidence of Barnett's specific intent here was demonstrated by his chasing and shooting the victim multiple times, including once in the chest and once in the head.
Barnett's argument that no physical evidence existed to connect him to Andre's death is unpersuasive. In fact, in a case where there is no physical evidence to link a defendant to the crime charged, the testimony of one witness, if believed by the trier of fact, is sufficient support for a factual conclusion required for a verdict of guilty. State v. Marcantel , 2000-1629 (La. 04/03/02), 815 So.2d 50, 56. Here, there was ample witness testimony pointing to Barnett as the individual responsible for Andre's murder. The fact finder believed the witnesses-individuals who were testifying over four years after the incident and whose memories reasonably needed support from their more contemporaneous statements made shortly after the crime. Thus, after viewing the above evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime of second degree murder proven beyond a reasonable doubt. This assignment of error is without merit.
CONCLUSION
For the above reasons, we affirm Michael Barnett's conviction and sentence.
AFFIRMED.
*490 APPLICATION FOR REHEARING
Before Daniel Milton Moore III, Jeanette Giddens Garrett, Jeff Cox, James Mark Stephens - Writing, and Jay Bowen McCallum.
Rehearing denied.

Prior to ruling on the motions, the trial judge entertained the idea of reconsidering portions of recorded testimony from trial. The state opposed such an action, and filed a writ application with this court. Considering that no ruling had been made by the trial court, this court deemed the state's application as premature, and it was not considered. State v. Barnett , 51,427-KW (La. App. 2 Cir. 12/08/2016).