STEPHENS, J.
*640 This criminal appeal by Javonte Sanders arises from the First Judicial District Court, Caddo Parish, State of Louisiana. Following a bench trial, Sanders was found guilty as charged of second degree murder and sentenced to life imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence. Sanders now appeals his conviction and sentence. For the following reasons, we affirm Sanders' conviction and sentence.
FACTS
On November 3, 2010, Sherri Payton, age 47, was found deceased in her home located at 575 Lynbrook Boulevard in Shreveport, Louisiana. Results from her autopsy and evidence recovered at the crime scene established Payton died of a homicide. Investigators systematically ruled out possible suspects. This matter became a "cold case," until law enforcement officers received an anonymous tip in 2013, leading them to investigate Payton's former neighbor, Javonte Sanders. Sanders was arrested on October 30, 2013, after forensic tests of fingerprints and DNA placed him at the crime scene. Sanders was subsequently indicted for the first degree murder of Sherri Payton in violation of La. R.S. 14:30 ; however, the charge was later amended to second degree murder, in violation of La. R.S. 14:30.1. During the pendency of Sanders' case, he was represented by multiple attorneys, both appointed and retained, and also represented himself for a period of time. Multiple pretrial motions were filed and argued on Sanders' behalf by multiple attorneys, as well as by Sanders in a pro se capacity. Sanders ultimately waived his right to a jury trial and elected to have a bench trial, which began on January 29, 2018, wherein 17 witnesses testified, all called by the state. After deliberation, the trial court returned a verdict of guilty as charged. Following his conviction, Sanders filed a motion for post-verdict judgment of acquittal and a motion for new trial, both of which were heard and denied on March 12, 2019. Sanders was sentenced on that same day to the mandatory sentence of life imprisonment at hard labor, without the benefit of parole, probation, or suspension of sentence. This appeal by Sanders ensued.
DISCUSSION
On appeal, Sanders asserts that (1) the evidence at trial was insufficient to support his conviction; (2) the trial court erred in denying his request for a fingerprint expert; (3) the trial court erred in denying his motions for continuance; and, (4) the trial court erred in denying his motion to suppress his recorded statement.
Sufficiency of the Evidence
In his first assignment of error, Sanders argues the evidence introduced by the state at trial to convict him of second degree murder was circumstantial in nature and was not sufficient to negate every reasonable hypothesis of innocence. At trial, the state called Payton's son, Kory Hill, as its first witness. He testified Sanders was a childhood friend from the neighborhood but there was no reason Sanders would be inside Payton's home. Hill stated it had been a year or more since he had lived in his mother's home. He further testified he normally spoke with his mother by telephone every evening and became worried when she had not answered his calls for three days, beginning October 31, 2010. He called several people asking if they had seen or spoken with Payton and ultimately made contact with his friend Kiwaun Wise, whom Hill asked to search his mother's house.
*641 On cross-examination Hill testified at the time of his mother's death, he had been incarcerated for three months. He stated while he was still living with his mother, a year or more before her death, he kept drugs in his mother's house. The state objected to the defense attorney's question to Hill of whether he kept or sold drugs from his mother's house on grounds the question was not relevant. The defense argued that Hill may have owed a debt to someone over the drugs and someone may have been responsible for Payton's murder. The trial court sustained the objection, finding there was enough of a gap in the three-month delay from Hill's arrest to Payton's murder that Hill's obligations to other parties were not relevant to the instant offense.
Breunka Hawkins, the mother of Hill's young daughter, Ka'lasia, testified she had lived with Payton during her pregnancy, and the house was always kept clean because Payton was a "neat freak." After Ka'lasia was born, Payton helped in transporting Ka'lasia to and from daycare. Payton also kept a bedroom for Ka'lasia at her house. Hawkins testified she was in Payton's home every week, and it was always clean and picked up, including Ka'lasia's room. Hawkins last saw and heard from Payton on October 30, 2010, which was the last time she and Ka'lasia were at Payton's home. On November 2, Hawkins unsuccessfully attempted to reach Payton. On November 3, Payton did not arrive to pick Ka'lasia up, and Hawkins again was unsuccessful in reaching Payton on the phone. At noon on November 3, Hawkins stopped at Payton's house and knocked on the door, but no one answered. Hawkins saw that Payton's car was gone and the mail remained in the mailbox. Hawkins saw through the front bathroom window that the bathroom light was left on, which Hawkins testified was unusual.
Ashley Thomas, the mother of Hill's infant son, Koryion, last saw Payton when they visited Hill in jail on October 31, 2010. Afterward, they returned to Payton's house. Thomas said there was no broken window or broken glass in the kitchen and the house was clean, just as it always was. Thomas testified she left Payton's house between 8:00 and 9:00 p.m. on October 31. She tried to reach Payton by phone on November 1 and 2, but she never saw or heard from Payton again. At Hill's request on November 3, Thomas stopped by Payton's home between 7:30 and 7:45 a.m. Thomas testified no one answered her knock on the front door. Seeing Payton's vehicle was gone, Thomas thought Payton had left for work. Later that same afternoon, Hill called Thomas at work, and she assisted Hill in reaching his close friend Kiwaun Wise on the phone. Wise was near Payton's house and agreed to stop by.
Kiwaun Wise testified when he arrived at Payton's house on the evening of November 3, 2010, he found the front door locked but was able to enter the kitchen through the unlocked door in the carport. In the kitchen, Wise saw the back door window was broken. Entering the bathroom, he found Payton, nude and laid over the edge of the bathtub, with her hands in the water. Wise called 911, and members of the Shreveport Fire Department and Shreveport Police Department responded at approximately 6:20 p.m.
Michael Cook, Jr., a fire department paramedic, arrived on the scene and observed Payton had no pulse and that rigor mortis had occurred. Corporal Gary Thomas and Sergeant Christi Snell testified they saw the broken back door window and a child's room in complete disarray, with a smashed piggy bank, coins scattered across the floor, and items tossed around. The officers testified they found Payton face down, with her upper body draped *642 across the edge of the bathtub, which was partially filled with water. Payton was nude except for a bra, unhooked and hanging from her shoulders. Sgt. Snell testified multiple bruises and fibers were visible on Payton's body.
Corporal Thomas further testified Payton's missing white Grand Am sedan was found on November 4, 2010, parked several miles away in an apartment complex. Sgt. Snell, who was also a security officer at the apartment complex, stated the vehicle was not at the apartment complex during her morning shift on November 3. She testified no surveillance video was available from the apartment complex. The vehicle was towed to the police department for processing and printing.
Sergeant Tracy Mendels, a crime scene investigator with the Shreveport Police Department, testified that as she arrived at Payton's house around 6:46 p.m. on November 3, 2010, she observed the intense odor of bleach emanating from the house. She stated the smell got stronger as she entered the house and became much stronger as she entered the bathroom. The odor appeared to be coming from the bathtub. Sgt. Mendels observed Payton's hands soaking in the bathtub water, from 3-4 inches above her wrists to her fingertips. Sgt. Mendels stated discoloration on Payton's hands indicated how the water level in the bathtub changed and dropped over time. Payton still had several pieces of jewelry on her person. Sgt. Mendels testified the bra found hanging from Payton's shoulders was frayed, as if cut. She noted Payton was bruised all over her body, including her face. Sgt. Mendels observed on Payton trace evidence, including hair, carpet fibers, and debris. Sgt. Mendels testified she also noticed tape marks on the victim's legs. Touching them with her gloved hands, she found the markings were sticky. Sgt. Mendels did not take a sample of the bathtub water.
Sergeant Mendels observed that the home was extremely well-kept and very neat, with the exception of the small bedroom clearly decorated for a young girl. Sgt. Mendels noticed a poster had been knocked from the wall, and a table and chair appeared to have been tossed onto the bed. Adult-size clothing-a blue rain jacket and knee-high leather boots-were on the floor along with a multicolored brown scarf and a shower cap. The floor was covered in loose change and the pieces from a smashed pink ceramic piggy bank. Sgt. Mendels secured viable fingerprints from the piggy bank pieces, which were transferred to Sgt. Duddy for analysis. In the master bedroom, Sgt. Mendels saw a skirt and a board game placed on the bed. She stated Payton's jewelry boxes and purses did not appear disturbed, missing anything, or dumped out, and Payton's checkbooks remained in her purse. However, Sgt. Mendels noticed a large rectangle-sized void in the dust on the floor suggested that something, perhaps a rug, had been removed from the floor in front of the bed. Sgt. Mendels also recovered one of Payton's journals, in which a quote had been written in cursive, and above it, upside down, someone had printed the word "die." No fingerprints were recovered from the journal. In the laundry room, Sgt. Mendels found a wad of paper towels in the trash can. She testified the towels were covered in a "gross" shiny material, appearing to be "snot" or saliva, and was still wet. In the kitchen sink, Sgt. Mendels found a serrated blade knife she thought might have been used to cut Payton's bra strap. However, no fibers from the bra were found on the knife. Sgt. Mendels did not find any containers of bleach or anything containing bleach in the home, and she did not find any tape.
*643 Sergeant Mendels further observed burglar bars covered every window except the one in the back door. She testified, other than the broken back door window, none of the windows, doors, or door locks bore any signs of forced entry. She found tiny fragments of broken glass inside the kitchen in front of the back door, but found large broken pieces of glass outside, at 5-6 feet and at 20 feet from the back door. Because of rain, Sgt. Mendels was unsuccessful in recovering latent prints from the broken pieces of glass, which were found in the yard. She stated the outside of the back door appeared to have been wiped. Sgt. Mendels photographed the entire crime scene and retained various items for further processing.
The next day, November 4, 2010, Sgt. Mendels processed Payton's car. Sgt. Mendels testified as she walked up to the vehicle, she observed a strong odor of bleach and when she opened the car door, the odor became extremely strong. She found the entire vehicle had a "just washed" appearance and had been wiped down. However, she noticed fresh mud splatter on the inside of the car door frame was not on the outside. Sgt. Mendels examined the vehicle but no prints of any value were recovered.
Long Jin, M.D., a forensic pathologist, was accepted as an expert in forensic pathology and testified about his autopsy of Payton, performed on November 4, 2010. Dr. Jin opined, based upon the body's condition, Payton had likely been deceased for 12-16 hours, plus or minus two hours, when her body was discovered in the early evening of November 3, 2010.
Dr. Jin testified he was able to rule out drugs, alcohol, and disease as a cause of death, and Payton did not die of natural causes or accident. He stated Payton had numerous blunt-force injuries over her body, noting contusions, abrasions, and lacerations found on Payton's face, head, shoulders, arms, chest wall, thighs, knees, and lower legs. Dr. Jin pointed out significant contusions to both temporal sides of Payton's head were not small, but rather a "pretty good size" and could have been made by a fist. Payton had two small lacerations on the right side of her lower lip, contusions on her neck below her chin, and a contusion on her left jaw. Additionally, he noted a laceration in Payton's vaginal area and contusions on her right inner thigh. Dr. Jin testified Payton's cause of death was asphyxia due to forceful drowning, based upon the condition of the body and the evidence at the scene where Payton was found by the bathtub filled with water. He noted that when a person is submerged in water, their air is cut off and they suffocate. Dr. Jin testified water or liquid might be found in the lungs or stomach, but not always, and he did not find water in Payton's lungs or stomach. He also opined the multiple injuries found on Payton's body were consistent with someone being forcefully smothered or drowned, and the contusions and abrasions on Payton's neck and shoulders indicated that Payton struggled. Additionally, Dr. Jin noted evidence of a sticky residue on the victim's body suggested the possibility that Payton was tied up or bound at the time she was drowned. He testified that the manner of death was homicide.
Dr. Jin noted Payton's hands, which were found submerged in the bathtub water, were a "unique yellow-whitish" color he had never seen before. He testified the color was consistent with a reaction to a chemical, such as bleach. Dr. Jin testified the crime lab tests only for drugs commonly found in the blood and not every chemical, drug, or toxin. He noted Payton's blood did not indicate the presence of any chemicals, but the lab would not have *644 tested for a chemical, such as bleach, unless specifically requested.
Henry Blake testified he was married to Rita Payton, the victim's sister. When he learned Sherri Payton was found dead on the evening of November 3, 2010, Blake went to Payton's house and found it blocked off by police. He testified it was nearly dark when a man walked up. Blake stated this man appeared to be about 5 feet, 5-6 inches tall, with what appeared to be a recent scar on his upper cheek. He testified the man asked, "What's up?" and then stated, "A woman must have been beat up pretty bad." Blake testified he was only 60 percent certain he would recognize the man. He then identified Sanders in court as the man who spoke to him in 2010. Blake testified he gave this information to Detective Ken Strickland about two to three weeks after Payton was found murdered.
Detective Ken Strickland of the Shreveport Police Department testified he took over the case investigation on August 24, 2011. He stated that on September 20, 2011, he interviewed Henry Blake about his conversation with an unknown male at the crime scene on the day Payton's body was discovered. Blake described the man to Det. Strickland as being 5 feet, 6-7 inches tall, and weighing about 200 pounds. Det. Strickland testified he obtained fingerprints and DNA swabs from a list of possible suspects for comparison with prints and swabs taken at the crime scene.
Corporal Clarence Van Wray, a community liaison officer with the Shreveport Police Department, testified that while at a community meeting on September 23, 2013, he was given an anonymous tip that Javonte Sanders was involved with the Payton homicide, and he passed the information to Shreveport Police Detective Greg Rudell (now retired).
Corporal Christian Hicks testified he was employed with the Shreveport Police Department and upon arriving at the scene, made contact with Kiwaun Wise. He assisted in securing the scene and obtained a description of Payton's car from a neighbor.
Sergeant Danny Duddy with the Shreveport Police Department was accepted as an expert in fingerprint identification analysis and testified he processed Payton's house for latent fingerprints on November 3, 2010. Sgt. Duddy testified when he entered the house, he observed a strong smell of bleach in the bathroom. He recovered viable latent prints from the back door and the bathtub tiles. Sgt. Duddy stated there is no limit of time that a fingerprint may exist on a surface, but prints may be degraded by time, cleaning and wiping, or humidity. Sgt. Duddy testified once a latent fingerprint is found, he determines whether the print is clear enough for a comparison and to make a conclusion on identification. A sufficient print is then compared against a known print and examined for ridge flow, patterns, ridge structure, spatial relationship, bifurcation, dots, and dissimilarities. Sgt. Duddy testified once his comparisons are made, they are then passed along for peer review.
Sergeant Duddy testified after comparing the latent prints he and Sgt. Mendels recovered at the crime scene against the list of known possible suspects and prints obtained by Det. Strickland, he found no fingerprint matches. He stated at Sgt. Rudell's request, he subsequently compared Sanders' known prints obtained from the Caddo Parish Sheriff's Department to the latent prints he recovered at Payton's house. Sgt. Duddy testified he found six prints that matched. Specifically, both Sanders' palm prints matched two prints recovered from the ceramic bathtub tiles *645 near Payton's body; Sanders' left thumb matched a print recovered from the nose of the smashed ceramic piggy bank; Sanders' right ring finger matched a print recovered from the broken glass of the backdoor window; Sanders' left palm matched a print recovered from the outside of the back door; and, Sanders' left ring finger matched a print recovered from the outside of the glass from the back door. Sgt. Duddy testified he also compared the latent crime scene fingerprints to known fingerprints of Sanders' brother, Demario Sanders, which were obtained from the Shreveport Police Department. He testified there was no match. Sgt. Duddy passed these prints to Lieutenant Owen McDonnell for review and confirmation. Sgt. Duddy testified Lt. Owen agreed with his conclusions.
Former Detective Greg Rudell confirmed he asked Sgt. Duddy to compare the latent prints recovered from the Payton crime scene to Javonte Sanders' known prints. Det. Duddy informed him Sanders' known prints matched some of the latent prints recovered at the crime scene. Det. Rudell testified he reviewed the original and supplemental reports of the investigation and spoke with Kory Hill. He then obtained a search warrant and an arrest warrant for Javonte Sanders. Sanders agreed to a voluntary interview at the Shreveport Police Department. Det. Rudell testified he and Det. Joshua Mayfield read Sanders his Miranda rights, and he signed the rights form.
Det. Rudell testified Sanders told him he had known Kory Hill for about seven years and he had been at the Payton house a few times before Hill moved out in 2008-2009. Sanders told the detectives he learned that Payton was missing, and later dead, from Larry Thomas, a friend who lived across the street from the Payton house. Det. Rudell testified Sanders stated he and Larry Thomas had gone by Payton's house after Hill moved out and after Hill went to jail, in order to check on Payton. Sanders stated there was no reason his fingerprints or DNA should be in Payton's house and denied killing Payton. Sanders was arrested and a DNA swab taken pursuant to the search warrant.
Larry Thomas, Jr., testified he lived at 578 Lynbrook Boulevard with his dad, and he was close friends with Kory Hill. Thomas testified Sanders lived down the street and he, Sanders, and Hill would hang out together, sometimes at Payton's house. Sometimes they entered the house and hung out in the kitchen or den, but mostly they hung out in the backyard. He stated he had not gone over to the Payton home since Hill moved out in 2008-2009, and he just spoke to Payton from across the street if he saw her outside.
As its final witness, the state called Jessica Esparza, Ph.D., with the North Louisiana Crime Lab. Dr. Esparza was accepted as an expert in forensic DNA analysis and testified about her tests of DNA evidence recovered from the crime scene. She testified that in December 2010, she received the case with 55 items and examined at least half of the items. Some items were not tested because the investigators determined the results would not be probative. Buccal DNA swabs obtained from Det. Strickland's list of possible suspects were sent to Dr. Esparza for testing. Dr. Esparza testified that suspected blood found on the bathtub was consistent with a known blood profile for Payton. She stated no viable DNA profile was obtained from Payton's left hand fingernails, but Payton's right hand fingernails revealed an autosomal DNA profile mixture of two individuals, one major contributor and one minor contributor. Sherri Payton could not be excluded as the major contributor, but the concentration of the minor contributor *646 was too low to obtain a valid autosomal DNA profile.
Dr. Esparza testified that she then used another, more sensitive test, which was able to target only the male chromosome in the DNA profile, even where there is an abundance of female DNA present. Using this test, Dr. Esparza was able to obtain a partial "YSTR haplotype" for the DNA profile obtained from the swab of Payton's right hand fingernails. She testified that 99.85 percent of the African-American population, 99.83 percent of the Caucasian population, and 99.81 percent of the Hispanic population could be excluded as a possible donor of this YSTR haplotype. Dr. Esparza stated that after comparing YSTR haplotype of the DNA profile found underneath Payton's right hand fingernails to the YSTR haplotypes of other possible known suspects provided by Det. Strickland, she found that none were consistent. However, she further testified that the YSTR haplotype from Sanders' DNA swab was consistent with the partial YSTR haplotype found under Payton's fingernails. She explained that the YSTR haplotype was shared by every male in a person's paternal lineage; therefore, Sanders and anyone in his paternal line could not be excluded as a possible donor of the DNA found under Payton's fingernails. Dr. Esparza testified the likelihood anyone else in the population would have this same YSTR haplotype profile was .15 percent of the African-American population, .07 percent of the Caucasian population, and .19 percent of the Hispanic population. After the state rested, the trial court advised Sanders of his rights to remain silent and to testify. Sanders elected not to testify and the defense rested.
Regarding the sufficiency of the evidence presented at trial, Sanders argues that Henry Blake's in-court identification of him as the man he spoke to at the crime scene on the day Payton's body was found was not reliable or credible. Sanders also contends the state's inability to exclude his DNA profile based on the YSTR haplotype testing does not sufficiently establish he was the minor contributor of the DNA found underneath Payton's right hand fingernails. Sanders asserts the trial court erred in considering his latent prints-found on the door of entry into Payton's home, on a smashed piggy bank inside the home, and on a porcelain bathtub tile above the tub where Payton's body was found-as evidence he was inside the home around the time of Payton's murder. Sanders argues the prints were merely evidence from his prior visits to the home on some undisclosed date, and the trial court erred in assuming the prints were recent to the crime simply because Payton's house was clean and tidy. We disagree.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; State v. Tate , 2001-1658 (La. 5/20/03), 851 So. 2d 921, cert. denied , 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed. 2d 248 (2004) ; State v. Ward , 50,872 (La. App. 2 Cir. 11/16/16), 209 So. 3d 228, writ denied , 2017-0164 (La. 11/22/2017), 227 So. 3d 827. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. Ward, supra . The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith , 1994-3116 (La. 10/16/95), 661 So. 2d 442 ; Ward, supra . The trier of fact is charged to make a credibility determination and may, within *647 the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Casey, 1999-0023 (La. 1/26/00), 775 So. 2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000) ; State v. Henry , 46,406 (La. App. 2 Cir. 8/10/11), 73 So. 3d 958.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton , 436 So. 2d 471 (La. 1983) ; State v. Robinson , 50,643 (La. App. 2 Cir. 6/22/16), 197 So. 3d 717, writ denied , 2016-1479 (La. 5/19/17), 221 So. 3d 78. In cases resting on circumstantial evidence, assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence. La. R.S. 15:438.
At the time of this 2010 offense, La. R.S. 14:30.1 provided, in pertinent part, that second degree murder is the killing of a human being when:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, assault by drive-by shooting, armed robbery, first degree robbery, second degree robbery, simple robbery, cruelty to juveniles, second degree cruelty to juveniles, or terrorism, even though he has no intent to kill or to inflict great bodily harm.
Specific intent is the state of mind that exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). State v. Jones , 46,758 (La. App. 2 Cir. 12/14/11), 81 So. 3d 236, writ denied , 2012-0147 (La. 5/4/12), 88 So. 3d 462. Specific intent need not be proved as a fact, but may be inferred from the circumstances of the transaction and the conduct of the defendant. State v. Odums , 50,969 (La. App. 2 Cir. 11/30/16), 210 So. 3d 850, writ denied , 2017-0296 (La. 11/13/17), 229 So. 3d 924. All that is necessary is that the defendant form the specific intent to kill or inflict great bodily harm for an instant when committing the crime. State v. Barnett , 52,406 (La. App. 2 Cir. 1/16/19), 262 So. 3d 477. Specific intent to kill or inflict great bodily harm may be inferred from the circumstances of the offense, the extent and severity of the victim's injuries, or the defendant's actions in deliberately pointing a gun and firing it at a person. State v. Barnett , supra ; State v. Odums , supra . The determination of whether the requisite intent is present is a question for the trier of fact. State v. Odums , supra .
Here, the trial court, as fact finder, weighed the credibility of the state's lay and expert witnesses, and the verdict suggests he found them credible. As noted above, the determinations of weight and credibility by the fact finder are given great deference and are not reassessed on review. A review of the record in its *648 entirety reveals the trial court could have reasonably found beyond a reasonable doubt that sufficient direct and circumstantial evidence existed to support the verdict that Sanders murdered Payton. Sanders' identity as the perpetrator was established where the direct and circumstantial evidence put Sanders at the scene of the crime during the time period that the crime was committed. Sanders' fingerprints on the outside of the back door, which was exposed to moisture and humidity, established that Sanders was at the house recently, in the timeframe of the murder. Crime scene investigators testified Payton's body was found draped over the bathtub, which was partially filled with water and a bleach-like chemical. The forensic pathologist testified Payton's extensive bodily injuries showed she strenuously fought and struggled before being asphyxiated by drowning or smothering. Sanders' palm prints were found on nearby porcelain bathtub tiles. It is unlikely the prints could have survived the exposure to water, moisture, steam, cleaning, daily use of the bathroom, and the events of Payton's murder and struggle near a tub partially filled with water and a bleach-like chemical. Thus, the palm prints established Sanders was in the house very recent to Payton's death. Sanders' involvement in Payton's murder is further suggested by the recovery of a partial male DNA profile found under Payton's right hand fingernails, which matched Sanders' male DNA profile.
The record further supports the fact finder could have reasonably found Sanders had specific intent to kill or inflict great bodily harm, which was established by testimony from the forensic pathologist. He noted the multiple contusions found all over Payton's body, including severe blows to her head, and the evidence indicating that Payton died of asphyxiation by drowning while bound with some type of adhesive tape.
As noted by the trial court in its ruling, simply no reasonable hypothesis of innocence can explain the presence of the forensic evidence in the home other than Sanders' guilt. Therefore, viewing the direct and circumstantial evidence in a light most favorable to the prosecution, a rational trier of fact could conclude beyond a reasonable doubt that Sanders was guilty of every essential element of the crime of second degree murder. This assignment is without merit.
Denial of Request for Fingerprint Expert
In his second assignment of error, Sanders asserts the trial court erred in denying his request for funds to retain an independent fingerprint expert. Sanders' November 29, 2016, pro se motion stated the matter "involves allegations of partial fingerprint evidence that was compared by Sgt. Duddy at the Shreveport Police Department." Sanders asserted, "A fingerprint expert with the proper curriculum vitae will clear law enforcement of any wrongdoing to expose the illegality of evidence to obtain through means that in fact violate rules, guidelines, and procedures established by constitutional laws." He further argued, "In order to properly defend this matter and provide an effective and adequate defense of his issue, it's necessary to have the partial fingerprints in question analyzed by an expert to determine if they are usable for a legal comparison." Sanders contended fundamental fairness would be violated if he were denied the opportunity for an expert of his choosing, to examine critical evidence whose nature is subject to varying expert opinion. He further asserted, "The only means by which the defendant can defend against expert testimony by the state is to offer [an] expert of his own," and requested the trial court grant the motion and provide him with funding.
*649 At the hearing on the motion for expert funding, the state argued Sanders, through his prior retained counsel, had ample opportunity to cross-examine both of the state's experts, Sgt. Duddy and Lt. McDonnell, during the hearing on Sanders' Daubert motion to exclude fingerprint comparison and analysis testimony, and the cross-examination by prior defense counsel was sufficient for Sanders' defense. Citing State v. Touchet , 93-2839 (La. 9/6/94), 642 So. 2d 1213, the trial court found that Sanders failed to show a probability that an expert would be of assistance in his defense, given the prior cross-examination of the state's expert witnesses by prior counsel. The pro se motion for funding for a fingerprint expert was denied.
We note the Daubert motion to exclude fingerprint comparison and analysis testimony was filed on June 12, 2015, by Sanders' then-retained counsel. The motion asserted the state failed to provide any reports explaining how the fingerprint analysis was done. At the July 21, 2016, hearing on the motion, the state called Sgt. Duddy to testify about the process he used in analyzing the latent prints recovered at the crime scene against the known prints of possible suspects and Sanders. He was accepted as an expert in latent prints and testified he was the supervisor for the crime scene investigation unit and processed Payton's home for latent prints. After comparing the latent prints recovered against eight sets of known prints for possible suspects, he found no match. After Sanders was identified as a possible suspect in 2013, Sgt. Duddy compared Sanders' known prints to the latent prints recovered at the crime scene and found six matches. Sgt. Duddy made notes as he examined and compared each set of known prints against the latent crime scene prints. He used three levels of identification for each print and for each print considered the quality, the ridge detail, the ridge structure, the spatial relation, and the points. He also compared the latent prints to Sanders' brother, Demario Sanders, and found no matches. Owen McDonnell, a former latent print examiner for the Caddo Parish Sheriff's Department, was accepted as an expert in latent print examination and analysis and testified he examined the known and latent crime scene fingerprints and verified Sgt. Duddy's findings regarding the fingerprint exclusions and matches. The trial court ultimately denied Sanders' motion to exclude the fingerprint evidence.[1]
Sanders now argues his constitutional right to present a defense was violated when the trial court denied his pro se motion for funds to retain a fingerprint expert. He asserts the fingerprints found at Payton's home were the "linchpin" of the state's theory that he had been there at the time of Payton's death and argues a fingerprint expert was necessary to provide assistance at trial regarding the fingerprint analysis performed by the police officers. We disagree.
Due process under the Fourteenth Amendment requires that no indigent defendant be denied a meaningful and fair opportunity to present his defense. State v. Touchet, supra. In order to provide *650 an indigent with the "fair opportunity" to present his defense, the state has been required to provide to the indigent defendant cost-free assistance of court-appointed trial counsel. State v. Touchet, supra at 1214-15. Counsel must also be effective, and effective assistance requires that an indigent defendant's counsel be provided with the basic tools of an adequate defense at no cost to the indigent defendant. Id. While the Touchet court further observed that various types of expert assistance have been found crucial to an indigent person's defense, it also noted:
[F]or an indigent defendant to be granted the services of an expert at the expense of the state, he must establish that there exists a reasonable probability both that an expert would be of assistance to the defense and that the denial of expert assistance would result in a fundamentally unfair trial. To meet this standard, a defendant must ordinarily establish, with a reasonable degree of specificity, that the assistance is required to answer a substantial issue or question that is raised by the prosecution's case or to support a critical element of the defense. If the trial court finds that the indigent defendant is able to meet this standard, it is to authorize the hiring of the expert at the expense of the state.
Id. at 1216.
Here, the fingerprints recovered at the crime scene and matched to Sanders' known fingerprints were clearly, in this largely circumstantial case, a critical element of the case against Sanders. However, Sanders failed to establish "with a reasonable degree of specificity" that an independent fingerprint expert was required to answer a substantial issue about the fingerprints. In pretrial proceedings, Sanders' prior retained attorney persistently challenged the use of the fingerprints at trial. He insisted the state's fingerprint analyst, Sgt. Duddy, testify in detail about his examination of each latent fingerprint that he claimed was a match to Sanders' fingerprint. Sanders thoroughly cross-examined both Sgt. Duddy and Lt. McDonnell about their examinations and conclusions regarding the fingerprint comparisons.
Sanders failed to show how an independent expert's testimony would be of additional assistance regarding the analysis of the fingerprint evidence and merely made a general claim that an expert was needed to defend against this evidence. Thus, Sanders' claim failed to establish that state funding for an independent expert was warranted in this case. This assignment is without merit.
Denial of Motions for Continuance
In his third assignment of error, Sanders asserts the trial court erred in denying his motions for continuance filed upon his retention of an independent fingerprint expert and funds to retain private counsel. On January 19, 2018, Sanders, through appointed counsel, filed a written motion for continuance requesting the January 29, 2018, bench trial be reset. The motion explained that on Friday, January 12, 2018, Sanders asked counsel to request a continuance of the trial, and the following day counsel spoke with Sanders' mother, Mattie Belton, who informed counsel she had hired Eric Ray, of Glendale, Arizona, as an independent fingerprint expert. The motion also stated Belton had further informed counsel at that time she had sold property in order to obtain funds to hire private counsel and requested counsel obtain a continuance to allow the unnamed private attorney to enroll.
On January 26, 2018, the trial court issued a written ruling denying the motion for continuance. The trial court found that the January 29 trial date, which was set by *651 agreement on August 28, 2017, gave Sanders over five months to prepare and retain private counsel and independent experts. It further found Sanders' motion for continuance was dilatory in nature, would only serve to further delay the proceedings, and would not serve the interests of justice.
On January 29, 2018, the day of trial, counsel informed the trial court that earlier that morning, Belton had provided her with what purported to be a preliminary report from Eric Ray, and Sanders had asked counsel to request another motion for continuance. Counsel informed the court that on Saturday, January 27, 2018, she spoke with Ray, who stated after a preliminary review, he had a different opinion from the state's expert on some of the fingerprints. Counsel argued this difference in opinion was the basis for the request for continuance. Counsel further explained Ray stated he could be available to testify via telephone conference or could testify in person on a future date if counsel or Sanders' family could fly him in.
The trial court denied the motion, finding that the fingerprint issue was not new as the state's fingerprint evidence was not recently introduced and there had been an extensive hearing on the fingerprint evidence with a thorough cross-examination by Sanders' then-retained counsel. Citing State v. Walton , 440 So. 2d 850 (La. App. 2 Cir. 1983), writ denied , 443 So. 2d 1121 (La. 1984), the trial court held Sanders failed: to allege sufficient grounds under La. C. Cr. P. art. 709 to show a continuance was warranted for an absent witness; to specify the testimony the absent witness might provide; and, to show due diligence in procuring the witness' attendance. The trial court further found the "eleventh-hour" request did not warrant a continuance in this case that had been pending for so long, where the defense waited so long to procure the witness, and the purported preliminary report was not timely produced in discovery to the state, pursuant to La. C. Cr. P. arts. 725 and 726.
We note the record shows the trial court did not review the purported report from Ray prior to ruling on Sanders' motion. However, after the trial court's ruling, counsel informed the court "it was the usability that [Ray] disagreed with." The trial court then permitted Sanders to proffer Ray's report into the record, which was accomplished at the close of trial.
Sanders asserts the trial court erred in denying his January 19 and 29 motions to continue the trial set for January 29, 2018, where he had just retained an independent fingerprint expert, Eric Ray, and sought to again retain a private attorney. He argues the continuance was warranted because Ray's preliminary report, provided by Sanders' mother on the day of trial, indicated he disagreed with the state's fingerprint expert regarding the fingerprint analysis. Sanders contends the trial court's denials compromised his right to present a defense and impinged his right to choice of counsel. We disagree.
Upon a written motion at any time, the trial court may grant a continuance, but only upon a showing such a motion is in the interest of justice. La. C. Cr. P. art. 707. The decision whether to grant or refuse a motion for a continuance rests within the sound discretion of the trial judge, and a reviewing court will not disturb such a determination absent a clear abuse of discretion. La. C. Cr. P. art. 712 ; State v. Sullivan , 52,204 (La. App. 2 Cir. 8/15/18), 253 So. 3d 911. Whether a refusal to grant a continuance was justified depends on the circumstances of the particular case presented. State v. Snyder , 1998-1078 (La. 4/14/99), 750 So. 2d 832. Generally, a reviewing court will not reverse a conviction even on a showing of an *652 improper denial of a motion for a continuance, absent a showing of specific prejudice. State v. Snyder , supra ; State v. Jordan , 50,002 (La. App. 2 Cir. 8/12/15), 174 So. 3d 1259, writ denied , 2015-1703 (La. 10/10/16), 207 So. 3d 408.
While the Sixth Amendment to the U.S. Constitution, as well as La. Const. art. I, § 13, guarantee the accused the right to assistance of counsel and the right to counsel of choice, the accused may not force a postponement of trial by a last-minute change of counsel. State v. Roth , 52,359 (La. App. 2 Cir. 11/14/18), 260 So. 3d 1230. The trial court does not abuse its discretion in conducting orderly proceedings by denying a motion for continuance made the morning of trial in order to change counsel. State v. McCoy , 2014-1449 (La. 10/19/16), 218 So. 3d 535, rev'd and remanded on other grounds , --- U.S. ----, 138 S.Ct. 1500, 200 L.Ed.2d 821 (2018).
Louisiana C. Cr. P. art. 709 provides a motion for a continuance based upon the absence of a witness shall state all of the following:
(1) Facts to which the absent witness is expected to testify, showing the materiality of the testimony and the necessity for the presence of the witness at the trial.
(2) Facts and circumstances showing a probability that the witness will be available at the time to which the trial is deferred.
(3) Facts showing due diligence used in an effort to procure attendance of the witness.
In State v. Jordan , supra , this court found the trial court did not abuse its discretion by denying the defendant's motions for continuance where he offered no explanation of how the defense preparations were inhibited in the three years before trial and made no showing of prejudice as a result of the denial.
Here, Sanders' last-minute motion for continuance to allow new counsel to enroll did not provide a sufficient basis to warrant delaying trial. While Sanders had a right to counsel of his choice, and this court is cognizant of the financial burden often placed on families of incarcerated indigent defendants and the time it can take to secure funds to retain counsel, we note that Sanders made no complaints about his appointed attorney in the year since she was reappointed to represent him or, specifically, in the five months since the trial date had been set. Additionally, Sanders' motion merely alleged funds to obtain private counsel had been secured and sought an opportunity for private counsel to enroll. New counsel had not actually been retained or made an attempt to enroll, and potential counsel was not even mentioned by name in the motion or argument.
Likewise, Sanders' motions for continuance did not demonstrate a justifiable basis for delaying trial in consideration of the just-retained fingerprint expert. The record shows Sanders was indicted in 2013, and he learned on the day of his arrest and again during the 2016 Daubert hearing that the state had fingerprint evidence against him. Sanders' pro se motion to obtain state funding for a fingerprint expert was denied on January 17, 2017, a year before the trial, giving him time to seek supervisory review of the ruling or to timely retain an expert. The trial court noted that the trial date was set by agreement in August 2017; so again, Sanders had ample opportunity before the January 2018 trial date to prepare his defense and retain an independent fingerprint expert.
Furthermore, the mere assertion on the morning of trial that Sanders' independent fingerprint expert "had preliminarily *653 looked at the prints and that he had, as to some of the prints, a different opinion than what the opinion of the state's expert is" coupled with the day-of-trial delivery of the expert's purported preliminary report from Sanders' mother to appointed counsel does not satisfy the grounds for a continuance based on an absent witness under La. C. Cr. P. art. 709, or a showing of due diligence.
We further find Sanders does not show any specific prejudice was incurred as a result of the denials or demonstrate the likelihood the outcome would have been any different had his continuances been granted, he retained private counsel, or his fingerprint expert been ultimately allowed to testify. Ray's report notably indicates he compared Sanders' prints to five latent prints from Payton's home.[2] Ray found three of the comparisons, including the comparison of the latent print recovered from the piggy bank, were inconclusive, but Sanders could not be excluded as the source of the prints due to some similarities. He further reported two of the latent prints examined were determined to have originated from Sanders. The identified prints were recovered from the back door as well as the bathtub tile. In accordance with the above discussion regarding the sufficiency of the evidence, we find even had the continuance been granted and Ray testified and his report been introduced at trial, the totality of the evidence (which would then include testimony from Sanders' own expert placing Sanders at the scene of the crime), viewed in the light most favorable to the state, would have been sufficient both for a rational trier of fact to conclude beyond a reasonable doubt that Sanders was guilty of every essential element of the crime and to exclude every reasonable hypothesis of innocence.
Sanders has failed to demonstrate a continuance was warranted in the interest of justice. Therefore, the trial court did not abuse its discretion in denying Sanders' motions for continuance where his case had been pending for five years prior to trial and it had been eight years since Payton's senseless murder. We further find even assuming that the denials were improper, a showing of resulting prejudice to Sanders simply does not exist. Accordingly, this assignment of error is without merit.
Denial of Motion to Suppress Recorded Statement
In his fourth assignment of error, Sanders asserts the trial court erred in denying his motion to suppress his recorded statement. Sanders' appointed counsel initially filed the motion to suppress Sanders' statement made to police on October 30, 2013; private counsel later enrolled and argued the motion. At the hearing on the motion, Sanders argued he was not advised of the nature of the investigation as a homicide, and he was not advised the detectives already had a warrant for his arrest. Sanders also complained his many statements-he was done with the interview, he was done talking, he had nothing to say, and to take him to jail-should have been construed by the detectives as an invocation of his right to remain silent. He asserted his statement was rendered involuntary because the detectives ignored these statements.
The state called Det. Rudell to testify regarding the statement Sanders had given to him and Detective Joshua Mayfield on October 30, 2013. Det. Rudell stated *654 after the officers reviewed a rights form with him, Sanders signed the form and agreed to speak with the detectives. He stated Sanders was not forced, threatened, or coerced into making a statement, and Sanders was not granted any promises or leniency in exchange for his statement. Det. Rudell testified Sanders did not show any signs of being under the influence of drugs or alcohol, Sanders did not have any slurred speech or red eyes, and there were no signs that his ability to understand his rights or to make a statement was affected. Sanders told Det. Rudell he could read and write the English language. Det. Rudell testified that several times during the interview, Sanders stated he was done with the interview but then he continued to talk, and he never asked for any attorney. The detectives continued the interview as long as Sanders continued to talk.
Detective Mayfield also testified about the interview of Sanders. Det. Mayfield identified State's exhibit 1, which was a CD containing the audio recording of Sanders' interview and statement. Sanders advised them he had completed the 9th or 10th grade in school. Det. Mayfield explained Sanders was not under arrest and was informed he was under investigation for several recent burglaries. Det. Mayfield stated Sanders was not told he was under investigation for homicide or the detectives already had a warrant for his arrest. He testified when Sanders stated he did not wish to continue the interview, the detectives did not ask him more questions but rather made several statements, and the conversation just continued.
Sanders subsequently filed a motion for the in camera inspection of his recorded statement and specifically directed the judge to seven times where he allegedly asserted his right to remain silent but the detectives continued the interrogation. The trial court ultimately denied Sanders' motion to suppress, finding the statement was freely and voluntarily made and was admissible at trial.
During his interview with Detectives Rudell and Mayfield, Sanders stated he was born September 20, 1991, and that he lived at 421 Lynbrook Boulevard. He said he finished the 9th grade and could read and write English. The detectives advised Sanders he was under investigation for some recent burglaries and then read Sanders his rights. Sanders stated he had known Kory Hill about seven years and they were "real tight." Sanders stated he had not been at Payton's home after Hill moved out unless Hill was there or he was checking on Payton with Larry, who lived across the street from Payton. Sanders stated he saw Payton almost every day in the neighborhood, then Larry called and said she was missing. Sanders said a couple of weeks later, Larry told him Payton was dead, and someone had raped and killed her. Sanders stated when he found out, he went over to Lynbrook and everybody was still outside. Sanders stated he had maybe showered at Payton's house years before, but he did not stay there. When asked where he was "that night," Sanders told the detectives he was on Second Street at his grandmother's house, smoking marijuana with his cousin. Sanders denied being near Payton on November 3, 2010, and denied any involvement in her death. He stated there was no reason that his fingerprints should be in Payton's house.
At 36 minutes into the interview, Sanders stated he was done talking, and he was done with the interview. Sanders was asked why he was upset, and he replied he did not know anything about "it." The detectives eventually advised Sanders they had a search warrant to take a DNA sample from him, so it could be compared to *655 DNA recovered from the crime scene. The detectives also informed Sanders his fingerprints were found inside the house and established he was there. Sanders told the detectives he was done talking, he would not saying anything else, he had nothing else to say, and they could just take him to jail. Sanders never admitted any involvement in Payton's death.
Sanders argues the trial court erred in denying the motion to suppress his statement where he informed the officers multiple times he had nothing to say, and the interview was over. We disagree. La. C. Cr. P. art. 703(B) provides a defendant may move on any constitutional ground to suppress a confession or statement of any nature made by the defendant. The state bears the burden of proving the admissibility of a purported confession or statement by the defendant. La. C. Cr. P. art. 703(D). The state must establish that an accused who makes a statement during custodial interrogation was: first advised of his constitutional rights; understood and knowingly waived those rights; made the statement freely and voluntarily; and, did not make the statement out of fear, duress, intimidation, menaces, threats, inducements, or promises. State v. Garner , 52,047 (La. App. 2 Cir. 6/27/18), 250 So. 3d 1152, writ denied , 2018-1290 (La. 2/25/19), 266 So. 3d 288. Voluntariness is determined on a case-by-case basis, under a totality of the circumstances standard. Id. The admissibility of a confession or statement is a question for the trial court, and the trial court's factual determinations and conclusions will not be overturned unless not supported by the evidence due to the trial court's opportunity to observe witnesses and assess credibility. Id. The testimony of the interviewing police officers alone may be sufficient to prove that the defendant's statement was given freely and voluntarily. Id.
A review of the record establishes Sanders was properly advised of his rights, and his statement was freely and voluntarily given. Detectives Rudell and Mayfield testified Sanders was advised of his rights and he stated he understood and voluntarily gave his statement. Furthermore, both detectives testified Sanders did not appear to be under the influence of drugs or alcohol when he was advised of his rights or when he gave his statement. The trial court clearly found the detectives' testimony to be credible. The state met its burden to prove Sanders' statement was freely and voluntarily given and not made under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises.
We further note Sanders' statement did not include a confession. Sanders admitted only to knowing the victim and her son, he had been inside her house before, and he had been to her house to check on her since her son had moved out and been incarcerated. Sanders consistently denied any involvement in Payton's death or being at her house at the time of her death. Considering only the portion of the interview prior to Sanders' first assertion of silence, there is no showing that the trial court erred in admitting Sanders' statement. Sanders simply does not show that his assertion of his right to remain silent rendered the portion of his statement made prior to that assertion involuntary or inadmissible. Therefore, Sanders fails to show the trial court erred in denying the motion to suppress his statement. This assignment is without merit.
Pro Se Assignment of Error
In a pro se assignment of error, Sanders asserts the trial court deprived him of his state and federal constitutional *656 right to present a defense in violation of La. Const. art. I, § 16, and the Sixth and Fourteenth Amendments to the United States Constitution. He argues he was deprived of his right to present a complete defense when during the trial, the trial court sustained the objection to the defense's question whether Kory Hill possessed and sold drugs at his mother's house. Sanders argues the trial court erred when it "decided that the defense could not present evidence that an unidentified person killed the victim while looking for drugs and money stashed in her home by her son, Kory Hill." Sanders asserts the trial court erred in finding any debts Hill may have owed were irrelevant since Hill had been incarcerated for three months prior to Payton's death. We disagree.
Sanders makes no showing that Hill's obligations to anyone or his prior drug-related activities were relevant to the instant murder, where Hill testified at trial he had moved out of his mother's house over a year before her murder, and he had been incarcerated for three months before her murder. There was no evidence presented at trial that would specifically support the defendant's theory Payton was killed when someone was searching the home for stashed drugs. The only room in disarray was the child's room. Likewise, there was no testimony anything of value in the house appeared to have been taken. Instead, the victim's personal jewelry was found on her body, and the crime scene investigator testified her purse, jewelry box, and checkbooks appeared undisturbed. Furthermore, only Sanders' fingerprints were identified at the crime scene; all other potential suspects were excluded by the crime scene investigator, the crime lab, and detectives. Accordingly, Sanders fails to show the trial court erred in sustaining the objection. This assignment is without merit.
CONCLUSION
For the forgoing reasons, Javonte Sanders' conviction and sentence are affirmed.
AFFIRMED.

Following the trial court's denial of Sanders' Daubert motion, Sanders wrote retained counsel a letter threatening him with physical harm if he did not petition the court for funding for an independent fingerprint examiner and DNA expert. Sanders' retained counsel in turn filed a motion to withdraw as counsel on September 14, 2016, which was granted by the trial court. Sanders proceeded to represent himself, with the Indigent Defender's Office appointed as standby counsel, until he was re-appointed counsel on February 22, 2017.

While the report of Sanders' independent fingerprint expert, Eric Ray, was properly proffered into the record by Sanders' appointed counsel at the close of trial, the report did not initially appear as part of the appellate record. However, this court subsequently obtained and reviewed the proffered report.