671 So.2d 1208 (1996)
STATE of Louisiana, Appellee,
v.
James K. WILLIAMSON, Appellant.
No. 27,871-KA.
Court of Appeal of Louisiana, Second Circuit.
April 3, 1996.
*1209 Kurt J. Goins, New Orleans, for Appellant.
Richard Ieyoub, Attorney General, Paul J. Carmouche, District Attorney, Theresa H. Bloomfield, Catherine M. Estopinal, Asst. District Attorneys, for Appellee.
Before NORRIS, WILLIAMS and GASKINS, JJ.
GASKINS, Judge.
The defendant, James K. Williamson, was convicted of first degree murder and was sentenced to serve life in prison without benefit of parole, probation or suspension of sentence. The defendant appeals, asserting that there was insufficient evidence upon which to base his conviction. For the reasons stated above, we affirm the conviction and sentence of the defendant.

FACTS
The defendant was convicted of the first degree murder of Estal Thompson. The offense occurred at the Soap Opera Washateria on Pines Road in Shreveport on June 19, 1993. The defendant entered the washateria and was in the process of abducting Vickie Ferguson, his former paramour. Mr. Thompson and his sons, Michael and Scott, intervened. All three men were shot by the defendant. Estal Thompson died at the scene. Scott and Michael Thompson were seriously injured, but survived.
The defendant had a long term relationship with Vickie Ferguson. The defendant and Ms. Ferguson lived together for a number of years and had a child. In May, 1993, the defendant and Ms. Ferguson ended their relationship. Ms. Ferguson, who was employed as a waitress at a diner, met Scott Thompson and began a relationship with him. Scott Thompson, his father, Estal Thompson and his brother, Michael, were from Toledo, Ohio. The men were in Shreveport working on a welding project at a local business. A family friend, Jerry Talbert, was also working with the Thompsons.
The men stayed at a motel on Monkhouse Drive and ate most of their meals at the diner where Ms. Ferguson was employed. In June, Ms. Ferguson began staying at the motel with Scott Thompson. In early June, the defendant and Scott Thompson had a confrontation at a hotel lounge in which the defendant shoved Scott Thompson. The altercation ended when the barkeeper threatened to summon the police.
On June 9, 1993, Ms. Ferguson filed a petition in juvenile court for a protective order against the defendant and for sole custody of their child. She was granted temporary sole custody and a temporary protective order was entered against the defendant, pending a hearing on June 15, 1993.
On June 15, 1993, a house owned by the defendant's sister was burned in an arson fire. Ownership of the house was to be transferred to the defendant in order for him to obtain a second mortgage so that he could finance a custody battle with Ms. Ferguson over the couple's child. The defendant contended that Ms. Ferguson was responsible for the fire.
That morning, the defendant was served with notice to appear in juvenile court that afternoon. At the juvenile court hearing, the defendant was granted a continuance to obtain counsel. The protective order and custody order were extended and the matter was set for hearing on June 29, 1993.
On June 19, 1993, the date of the present offense, the Thompsons, Mr. Talbert and Ms. Ferguson ate a late breakfast at the diner. They then went to the washateria to do laundry. Ms. Ferguson testified that the defendant telephoned her several times that day at the diner, conveying threats. The defendant contends that Ms. Ferguson telephoned him and asked him to come to the washateria to see their child.
The defendant arrived at the washateria, armed with a .45 pistol, and confronted Ms. *1210 Ferguson. Ms. Ferguson told the washateria attendant, Sandra Norwood, that there was someone there who was not supposed to be around her. According to Ms. Norwood, the defendant seized Ms. Ferguson by the hair and said, "If you don't go with me, I'm going to start shooting." Ms. Norwood went to a storage room and called 911.
Scott and Michael Thompson rushed at the defendant in an attempt to disarm him. Estal Thompson walked toward his sons to offer assistance. The defendant began firing, striking Estal Thompson twice in the heart, fatally wounding him. Scott Thompson was shot in the eye, neck and shoulder. He lost his eye. Michael Thompson was shot in the chest.
Ms. Ferguson managed to break away from the defendant during the altercation with the Thompsons. She fled to the storage room in which Ms. Norwood was calling 911. The defendant then came into the storage room, seized Ms. Ferguson by the hair and forced her to leave the washateria with him, at gun point. As the defendant fled, Ms. Norwood recorded his license plate number.
As they drove away from the scene, Ms. Ferguson was able to get the .45 pistol away from the defendant. She threw the gun out the car window. The gun was later retrieved by law enforcement officers a short distance from the washateria and was determined to be the same gun used to kill Estal Thompson. According to Ms. Ferguson, the defendant simply laughed and said that he had another gun and that they were going to die together.
The defendant's automobile broke down several miles from the washateria. The defendant forced Ms. Ferguson out of the car and into a drainage ditch where he began choking her. This activity was observed by passing motorists who stopped to render aid to Ms. Ferguson. One motorist, who was armed with a gun, threatened to shoot the defendant if he did not release Ms. Ferguson. The defendant eventually released Ms. Ferguson and fled into a wooded area.
The defendant was apprehended the next day. He was arrested and charged by grand jury indictment with the first degree murder of Estal Thompson. He was tried and found guilty as charged by unanimous jury verdict. The jury recommended that the defendant be sentenced to life imprisonment without benefit of parole, probation or suspension of sentence. The trial court sentenced the defendant accordingly. The trial court denied the defendant's post verdict motion for modification of the verdict. In that motion, the defendant asserted that the prosecution failed to prove that the defendant had the requisite specific intent to kill Estal Thompson. The defendant appeals his conviction.

SUFFICIENCY OF EVIDENCE
On appeal, the defendant asserts that there was insufficient evidence upon which to base his conviction of first degree murder. The defendant reasserts his argument that the prosecution failed to show that he had the requisite specific intent to kill Estal Thompson. The defendant argues that he did not know Mr. Thompson and that he fired his weapon only after being attacked by Scott and Michael Thompson. The defendant argues that the evidence is sufficient only to convict him of manslaughter. This argument is without merit.

Legal Principles
The relevant portions of La.R.S. 14:30 define first degree murder as follows:
A. First degree murder is the killing of a human being:
(1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, second degree kidnapping, aggravated escape, aggravated arson, aggravated rape, forcible rape, aggravated burglary, armed robbery, armed robbery, drive-by shooting, first degree robbery, or simple robbery....
(3) When the offender has specific intent to kill or inflict great bodily harm upon more than one person....
In reviewing whether there is sufficient evidence to support a conviction, an appellate court in Louisiana is controlled by the standard enunciated by the United States *1211 Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) and its progeny. This federal constitutional standard, which was adopted by the Louisiana legislature's enactment of La. C.Cr.P. Art. 821, pertaining to post verdict motions for acquittal based on insufficiency of evidence, requires the appellate court to determine if the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt. State v. Maxie, 93-2158 (La. 4/10/95), 653 So.2d 526; State v. Martin, 93-0285 (La. 10/17/94), 645 So.2d 190, cert. denied ___U.S___, 115 S.Ct. 2252, 132 L.Ed.2d 260 (1995); State v. Owens, 606 So.2d 876 (La.App. 2d Cir.1992). This standard of appellate review applies to all evidence, direct and circumstantial. State v. Owens, supra.
The defendant argues that the prosecution failed to prove all the essential elements of the offense because it did not prove that he acted with specific intent to kill or inflict great bodily harm. Specific criminal intent is defined as "... that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). Specific criminal intent need not be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Maxie, supra; State v. Johnson, 27,522 (La.App. 2d Cir. 12/6/95) 665 So.2d 1237; State v. Owens, supra.
The discharge of a firearm at close range and aimed at a person is indicative of a specific intent to kill or inflict great bodily harm upon that person. State v. Johnson, supra. All that is necessary is that the defendant form the specific intent to kill or inflict great bodily harm for an instant when committing the crime. State v. Castille, 590 So.2d 755 (La.App. 3d Cir.1991), writ denied 597 So.2d 1025 (La.1992).
The determination of whether the requisite intent is present in a criminal case is a question for the trier of fact. State v. Owens, supra; State v. Johnson, supra; State v. Butler, 618 So.2d 572 (La.App. 2d Cir.1993), writ denied 624 So.2d 1226 (La. 1993). In reviewing the correctness of such a determination, the court should review the evidence in the light most favorable to the prosecution and must determine whether the evidence is sufficient to convince a reasonable trier of fact of the defendant's guilt beyond a reasonable doubt as to every element of the offense. State v. Johnson, supra; State v. Butler, supra.
While this court's authority to review extends to questions of fact, such judicial power of review does not extend to credibility determinations. Decisions concerning credibility are the province of the trier of fact. Thus, in the absence of internal contradictions or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier, is sufficient to support the requisite factual conclusion. State v. Owens, supra; State v. Johnson, supra; State v. Green, 27,652 (La.App. 2d Cir. 1/24/96), 666 So.2d 1302; State v. Willars, 27,394 (La.App. 2d Cir. 9/27/95) 661 So.2d 673; State v. Harper, 27,278 (La.App. 2d Cir. 8/23/95), 660 So.2d 537.

Discussion
Based upon eyewitness testimony, the record shows that the defendant had the requisite specific intent to kill or cause great bodily harm to more than one person. The record also shows that the defendant had specific intent to kill or inflict great bodily harm upon the Thompsons while engaged in the second degree kidnapping[1] of Vickie Ferguson.
Sandra Norwood, the washateria attendant testified that after she asked the defendant *1212 to leave the premises, she heard him tell Ms. Ferguson, "If you don't come with me, I'm going to start shooting." She then heard three gunshots and saw Ms. Ferguson enter the storage room where she was. She then saw the defendant take Ms. Ferguson out of the storage room by force and cause her to leave the washateria with him, against her will.
Penny Brown was present at the time of the shooting with her six year old son. She testified that she saw the defendant confront Ms. Ferguson. The defendant said "If she doesn't come with me, someone will get hurt." She saw Ms. Ferguson get away from the defendant and saw a struggle ensue between the defendant and some men. She heard three or four gunshots which struck the men struggling with the defendant. As Ms. Brown was huddled on the floor with her son, the defendant said to her, "That's right. You stay down too or you'll get shot, too."
Lucy Brooks was also present at the washateria on the day of the shooting. She testified that the defendant entered the washateria and confronted a group of people. Ms. Brooks then fled to the storage room. She heard several gun shots and saw Ms. Ferguson enter the storage room. The defendant then drug Ms. Ferguson out of the storage room and forced her to leave with him. She saw two men lying on the floor and a third man leaning against the back door.
Michael Thompson testified that the defendant entered the washateria, chased Ms. Ferguson around and then grabbed her by her hair. Ms. Norwood, the washateria attendant, asked the defendant to leave. The defendant stated "I ain't leaving until I kill me some mother f_____s." The defendant then pulled a gun and pointed it at Michael and Scott Thompson. The Thompson brothers rushed at the defendant in an effort to disarm him. The defendant fired seven shots and then forced Ms. Ferguson to leave with him.
Scott Thompson testified that the defendant entered the washateria and grabbed Vickie Ferguson. He testified that the defendant stated, "I'm going to shoot her and some other mother f_____s. Who wants it first?" The defendant then pulled a gun and pointed it at Michael and Scott Thompson. Michael and Scott Thompson rushed the defendant in an attempt to disarm him. The defendant released Ms. Ferguson and then began firing.
Jerry Talbert testified that he saw the defendant grab Ms. Ferguson. When Ms. Norwood asked the defendant to leave the premises, he heard the defendant say, "I'm fixin' to kill somebody." After the Thompsons rushed the defendant and the defendant fired his gun, Mr. Talbert saw the defendant force Ms. Ferguson to leave with him.
Dr. George McCormick, Caddo Parish Coroner, testified regarding the result of the autopsy performed upon Estal Thompson. He stated that two bullets entered the left chest, passing through the heart and lung. The trajectory of the bullets and the proximity to each other were consistent with the shooter facing the victim and firing twice at a range of two to six feet. Dr. McCormick stated that the fact that both shots struck the victim in the heart was consistent with an intent to kill. Dr. McCormick stated that both shots were dead centered on the heart, which is consistent with an intent to kill. He stated that he could not remember ever having a case where it was shown that wounds this well placed were accidental.
The defendant argues he is guilty only of manslaughter. He argues that he fired his weapon only after being attacked by the Thompsons. He also argues that he shot while his back was turned to his assailants. However, testimony indicates that the defendant aimed and fired at Estal Thompson. The record supports the jury's finding that the defendant possessed the requisite specific intent to kill Estal Thompson. The record shows that on June 19, 1993, the defendant entered the Soap Opera Washateria, armed with a .45 pistol. The defendant was the only person present at the scene who was armed. The defendant grabbed Ms. Ferguson by the hair and pulled out his gun. The defendant refused to leave when asked to do so by the washateria attendant. Numerous witnesses testified that the defendant stated his intent to kill some one. When the Thompsons sought to aid Ms. Ferguson and *1213 disarm the defendant, the defendant shot Estal Thompson in the chest, at close range, killing him. The defendant then forced Ms. Ferguson to leave the washateria with him at gun point.
Under the standard announced in Jackson v. Virginia, supra, there is sufficient evidence in this record upon which the jury could find all the elements of first degree murder had been proven beyond a reasonable doubt. From the facts, the jury could reasonably conclude that the defendant possessed the requisite specific intent to kill or inflict great bodily harm upon more than one person. The jury could also have concluded that the defendant had the specific intent to kill Estal Thompson while the defendant was engaged in the perpetration of the second degree kidnapping of Vickie Ferguson. The circumstances present in this case indicate that the offender actively desired the prescribed criminal consequences to follow his action. There is ample evidence in the record upon which to base the defendant's conviction for first degree murder.

CONCLUSION
For the reasons stated above, we affirm the conviction and sentence of the defendant, James K. Williamson.
AFFIRMED.
NOTES
[1] La.R.S. 14:44.1 provides in pertinent part:

A. Second degree kidnapping is the doing of any of the acts listed in Subsection B wherein the victim is:
(4) Imprisoned or kidnapped when the offender is armed with a dangerous weapon....
B. For purposes of this Section, kidnapping is:
(1) The forcible seizing or carrying of any person from one place to another....