Judgment rendered November 15, 2023.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 55,354-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                    Appellee

versus

DEMETRIOUS MCCOY, SR.                 Appellant

* * * * *

Appealed from the
Twenty-Sixth Judicial District Court for the
Parish of Bossier, Louisiana
Trial Court No. 222,303

Honorable Douglas Stinson, Judge

* * * * *

LOUISIANA APPELLATE PROJECT          Counsel for Appellant
By: Peggy J. Sullivan

DEMETRIOUS MCCOY, SR.                Pro Se

J. SCHUYLER MARVIN                    Counsel for Appellee
District Attorney

CODY ALLEN BOYD
RICHARD RUSSELL RAY
JOSEPH CHANCELLOR NERREN
Assistant District Attorneys

* * * * *

Before ROBINSON, HUNTER, and ELLENDER, JJ.

**ELLENDER, J.**

Demetrious McCoy, Sr., was convicted of second degree murder, La. R.S. 14:30.1, and now appeals arguing insufficiency of the evidence, as well as alleging the trial court erred by allowing other crimes evidence, denying his motion to continue, and failing to grant his challenges for cause of potential jurors. For the reasons expressed, we affirm.

## FACTS

Hannah Sheffield was shot and killed in an apparent drive-by shooting on the evening of April 10, 2021. The facts which led to McCoy's arrest, and ultimately his conviction for this crime, included multiple incidents which took place in the weeks preceding the murder.

On the night of March 20, 2021, McCoy, a/k/a "Trill," and Quinton Pappillion were in a fight at a nightclub called the Hive in Shreveport when Pappillion struck McCoy with a bottle and knocked him out cold. In the early morning hours following this fight, around 2:00 a.m. on March 21, 2021, at Pappillion's grandmother Annie Lynn's home on 1417 Cynthia Lane, Shaquan Hicks, who was staying there for the night, heard several gunshots outside. Though Pappillion was not present at the time of the shooting, he was sometimes there with his grandmother, and even listed 1417 Cynthia Lane as his address on his driver's license.

Once Hicks awoke later that morning, she discovered a tire was low on her car and, when she took it to a shop to be repaired, one of the employees handed her a bullet which he had discovered in her tire. Hicks then went back to Lynn's house and reported this discovery to the Bossier City Police Department ("BCPD"), who sent Officer Michael Blair

to investigate. Ofc. Blair interviewed Hicks and examined the bullet, as well as Hicks's car and the surrounding area, discovering an apparent bullet hole in the back taillight of Hicks's car, leading directly to her tire. Hicks stated she had no knowledge of when or how the bullet became lodged in her tire, but that this tire frequently lost air. Ofc. Blair also observed markings on the concrete around Hicks's car that appeared to be made by gunshots, but found no other bullet holes in the surrounding area. As for the bullet from the tire, Ofc. Blair remarked that it appeared quite old and looked as though it had skipped off the ground.

Ten days later, on March 31, 2021, Pappillion contacted the BCPD and reported that a man he knew as "Trill" drove by his girlfriend's apartment, where he was staying at the time, and pulled a gun on him, but he ducked to avoid being shot as the car drove away. When Officer Brandon Bailey arrived, Pappillion claimed that he was outside getting ready to take his son to school when "Trill," who has a tattoo on his neck bearing this name, drove by and pointed a pistol at him. Pappillion definitively stated he has known "Trill" for years, but did not know his real name, and that "Trill" was the same person he had recently knocked out in a fight at the Hive. Pappillion was also adamant in his statement to Ofc. Bailey that it was common knowledge "Trill" had fired shots at his grandmother's house in the early morning hours following their bar fight. Pappillion's statement to Ofc. Bailey was captured on his body camera, and clearly shows a white Toyota Camry four-door sedan, with black rims, directly in front of the apartment where Pappillion was staying. In the subsequent murder investigation, it was discovered McCoy has a tattoo on his neck which reads "Trill."

2

On the evening of April 10, 2021, McCoy was in the Barksdale Annex[1] neighborhood of Bossier City hanging out with Raymaad West and Detroylous Abbot. As night fell, McCoy drove away by himself in a dark blue 2020 Dodge Charger, with dark rims, which he had borrowed from his sister earlier that day. Not long thereafter, West and Abbott both heard gunshots and attempted to contact McCoy by phone, but he did not answer or respond.

At 8:23 p.m. that evening, a 911 call came in to the BCPD regarding a shooting at the intersection of McElroy St. and Evans St. in the Barksdale Annex neighborhood. When officers arrived on the scene, a white 2003 Toyota Camry four-door sedan, with dark rims, was found crashed into a nearby house. Hannah Sheffield was inside the car, already deceased, with three gunshot wounds to her upper body. Officers recovered two .45-caliber shell casings in the roadway at the corner of McElroy St. and Evans St. and, based on the location of the casings, concluded the firearm that discharged the casings was likely moving at the time it was fired.

Detective Briton Hampson of the BCPD was assigned as the lead investigator. Two days after the shooting, Det. Hampson conducted a video interview with McCoy, who admitted he was in a fight with Pappillion at the Hive on March 20, and that he was in the Barksdale Annex neighborhood on the evening of April 10 driving his sister's dark blue Dodge Charger. Det. Hampson obtained the license plate number of the Charger and ran it through the License Plate Reader System (a camera system that takes photos of every car's license place as it passes through an intersection). At 8:23

_____

[1] The neighborhood is also sometimes commonly referred to as Jack's Quarters.

3

p.m. on the day of the shooting, the License Plate Reader photographed the dark blue Charger McCoy was driving heading north through the intersection of Airline Dr. and Murphy St., two blocks from where the shooting occurred.  Det. Hampson was also able to obtain video surveillance footage from a water tower located on McElroy St., less than a block away from the location of the shooting.  This footage first showed a white Camry, with dark rims, going in one direction, then a dark-colored car, with dark rims, traveling in the opposite direction at approximately 8:22 p.m.[2]  During the course of his investigation, Det. Hampson also visually inspected and photographed the Charger, which he confirmed was dark blue with dark rims.  The investigation also revealed Pappillion drove a 2005 white Camry four-door sedan, with dark rims, virtually identical to the vehicle driven by Sheffield.

Two bullets, one of which was found and removed from Sheffield's body, along with two casings recovered from the scene, were sent to the North Louisiana Crime Lab for further examination.  Summer Johnson, an expert in forensic firearm and ballistic examination at the crime lab, determined the casings each belonged to the same .45-caliber gun.  Johnson stated she was unable to determine whether the bullets were also from this same gun given their condition when she received them, flattened from hitting a hard object.  Johnson also examined the bullet found in Hicks's tire following the March 21 incident on Cynthia Lane.  Johnson determined the bullet recovered from Sheffield's body and the bullet from the March 21

---

[2] The time stamp on the video actually depicted the time as 8:07 but it was estimated to be approximately 15 min. behind that of real time.  This was confirmed by both the Bossier City Water Department and Det. Hampson.

4

incident had similar class characteristics because their caliber and grooves were consistent with each other, and each shared matching unique markings.

## PROCEDURAL HISTORY

Following the investigation, McCoy was arrested and charged by bill of indictment with the second degree murder of Hannah Sheffield. A *Prieur* hearing was held on August 1, 2022, after which the trial court allowed evidence of the March 20 bar fight, the shooting at Cynthia Lane in the early morning hours of March 21, and the March 31 aggravated assault. Trial began the next day but, before jury selection, McCoy orally moved for a continuance based on Pappillion's testimony in the *Prieur* hearing that a now deceased person made a statement to him in a phone call possibly confessing to Sheffield's murder. The motion to continue was denied, but Pappillion was allowed to testify about the statement. At the conclusion of trial, the jury returned a unanimous guilty verdict convicting McCoy as charged of second degree murder. McCoy then filed motions for judgment of acquittal and new trial, which were both denied by the trial court. After being sentenced to life imprisonment without benefits, he filed this appeal.

## DISCUSSION

### *Sufficiency of the Evidence*

In his first assignment of error, McCoy argues there was no direct evidence or testimony adduced at trial which connected him to the shooting of Sheffield, and that the circumstantial evidence presented was insufficient to support his conviction of second degree murder.

McCoy claims the jury had to make several assumptions, without sufficient evidence, in order to reach a guilty verdict. He also submits the state attempted to link the shooting of Sheffield to the March 21 shooting at

Cynthia Lane by comparing the projectiles found at both scenes, but he points out the ballistics expert could only determine the projectiles were fired from the same caliber gun, not the same actual gun. He maintains no eyewitness saw who fired any of the shots. McCoy also questions some of the testimony adduced at trial. Pappillion claimed to be frequently intoxicated for, as he put it, "the majority of 2021." Pappillion testified that because of his habitual impairment, he did not recall the altercations he had with McCoy at the Hive, his belief that McCoy was responsible for the shooting at Cynthia Lane, or the alleged aggravated assault by McCoy that occurred on March 31 at Pappillion's girlfriend's house. McCoy concedes the testimony of West and Abbot did confirm he was in the Barksdale Annex neighborhood the night Sheffield was shot but, he asserts, West and Abbot did not see him with a gun nor did they find him to be angry or upset. Lastly, McCoy argues no credible evidence placed him at the scene of the April 10 murder, or at the March 21 shooting near Pappillion's grandmother's house, or at the March 31 aggravated assault of Pappillion; and that the circumstantial evidence presented was insufficient to support a finding of guilt.

The standard of appellate review for sufficiency of the evidence to uphold a conviction is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004). This standard does not provide an appellate court with a vehicle for substituting its appreciation of the evidence

6

for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517. The trier of fact makes credibility determinations and may accept or reject the testimony of any witness. *State v. Casey*, 99-0023 (La. 1/26/00), 775 So. 2d 1022, *cert. denied*, 531 U.S. 840, 121 S. Ct. 104, 148 L. Ed. 2d 62 (2000). The appellate court does not assess credibility or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442.

The *Jackson* standard is applicable in cases involving both direct and circumstantial evidence. *State v. Braden*, 55,275 (La. App. 2 Cir. 9/27/23), __ So. 3d __. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. *Id.* When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. *State v. Sutton*, 436 So. 2d 471 (La. 1983); *State v. Norman*, 51,258 (La. App. 2 Cir. 5/17/17), 222 So. 3d 96, *writ denied*, 17-1152 (La. 4/20/18), 240 So. 3d 926.

Direct evidence provides proof of the existence of a fact, for example, a witness's testimony that he saw or heard something. *State v. Lilly*, 468 So. 2d 1154 (La. 1985); *State v. Baker*, 49,175 (La. App. 2 Cir. 8/27/14), 148 So. 3d 217. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. *State v. Broome*, 49,004 (La. App. 2 Cir. 4/9/14), 136 So. 3d 979, *writ denied*, 14-0990 (La. 1/16/15), 157 So. 3d 1127. If a case rests essentially upon circumstantial evidence, that

7

evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438; *Broome*, *supra*; *State v. Gipson*, 45,121 (La. App. 2 Cir. 4/14/10), 34 So. 3d 1090, *writ denied*, 10-1019 (La. 11/24/10), 50 So. 3d 827.

McCoy was convicted by a unanimous jury of second degree murder. La. R.S. 14:30.1 provides, in pertinent part:

> A. Second degree murder is the killing of a human being:
>
> > 1) When the offender has a specific intent to kill or to inflict great bodily harm.

Specific intent is the state of mind that exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). As a state of mind, specific intent need not be proven as a fact, but may be inferred from the circumstances of the offense and the defendant's actions. *State v. Allen*, 41,548 (La. App. 2 Cir. 11/15/06), 942 So. 2d 1244, *writ denied*, 07-0530 (La. 12/07/07), 969 So. 2d 619; *State v. Coleman*, 52,074 (La. App. 2 Cir. 11/14/18), 2 59 So. 3d 1203. All that is necessary is that the defendant form the specific intent to kill or inflict great bodily harm for an instant when committing the crime. *State v. Williamson*, 27,871 (La. App. 2 Cir. 04/03/96), 671 So. 2d 1208, *writ denied*, 96-1143 (La. 10/04/96), 679 So. 2d 1380, *State v. Coleman*, *supra*. The determination of whether the requisite intent is present in a criminal case is for the trier of fact. *State v. Allen*, *supra*.

This record contains no evidence to suggest McCoy had the specific intent to kill Sheffield; there is, however, sufficient evidence for the jury to find that McCoy had the specific intent to kill Pappillion. The law allows

for McCoy's specific intent to kill Pappillion to be transferred to the killing of Sheffield. The doctrine of transferred intent provides:

> When a person shoots at an intended victim with the specific intent to kill or inflict great bodily harm and accidentally kills or inflicts great bodily harm upon another person, if the killing or inflicting of great bodily harm would have been unlawful against the victim actually intended to be shot, then it would be unlawful against the person actually shot even though that person was not the intended victim. *State v. Brooks*, 42,226 (La. App. 2 Cir. 8/15/07), 962 So. 2d 1220; *State v. Gilliam*, 36,118 (La. App. 2 Cir. 8/30/02), 827 So. 2d 508, *writ denied sub nom. State ex rel. Gilliam v. State*, 02-3090 (La. 11/14/03), 858 So. 2d 422.

The record is replete with evidence detailing several altercations between McCoy and Pappillion, showing animosity between these men. Although at trial Pappillion claimed he was impaired and did not remember, his video recorded statement given to Ofc. Bailey shortly after McCoy pointed a gun at him contradicted this claim. This video, which was played for the jury, depicts Pappillion as being very detailed and specific about what occurred between him and "Trill," someone he claimed to have known for years. Pappillion is quite lucid in the video and does not appear to be impaired in any way.

The record supports McCoy and Pappillion were in a fight on March 20 at a local bar in Shreveport, which ended with Pappillion knocking McCoy out with a bottle. In addition to Pappillion's statement, McCoy admitted to this fight in his videoed interview with Det. Hampson that was played for the jury. The totality of the evidence supports that McCoy, in an attempt at retaliation later that night, came by Pappillion's grandmother's residence on Cynthia Lane, where Pappillion was sometimes known to be, and fired multiple gunshots, one of which lodged into the tire of Hicks's car parked near the home. The evidence also suggests the same person who

9

fired shots on Cynthia Lane was likely the same person who shot Sheffield, including Pappillion's statement and the conclusion of the crime lab that the bullet recovered at this incident and the one recovered from Sheffield's body had similar characteristics and share unique markings. Certainly, the jury was presented with sufficient evidence to draw this conclusion.

The record also provides adequate details of the March 31 aggravated assault of Pappillion to support McCoy was the perpetrator. This assault occurred 11 days after the initial bar fight between these men and involved McCoy pointing a gun at Pappillion. While Pappillion testified at trial he did not remember this incident, the body camera footage of Ofc. Bailey captures Pappillion definitively and emphatically telling Ofc. Bailey what happened: a man he knew as "Trill," with a neck tattoo bearing this name, whom he had recently fought and knocked out, who he believed fired shots at his grandmother's house, and whom he saw clearly that day; drove by where he was staying and pointed a gun at him. While Pappillion only knew him as "Trill" and did not know his real name, McCoy has a distinctive and unique "Trill" neck tattoo. Further, if McCoy did not already know it, he would have discovered during the March 31 aggravated assault that Pappillion drove a white Toyota Camry four-door sedan, with black rims, as it was parked right in front of the apartment where Pappillion was staying and is clearly visible on the body camera video of the responding officer.

All of these prior incidents provide evidence of McCoy's motive and intent to fire multiple shots on April 10 into a white Camry four-door sedan, with black rims, nearly identical to the vehicle seen at Pappillion's home ten days before, a vehicle he was known to drive.

10

On the day of the murder, immediately prior to Sheffield's tragic death, McCoy was hanging out in the same neighborhood where the shooting occurred. Significantly, two witnesses testified that McCoy was in the Barksdale Annex neighborhood and drove away in his sister's Charger, and McCoy even admitted to officers in a video interview that he was indeed there just minutes before the shooting. Further, these same witnesses testified McCoy was driving a dark blue Dodge Charger, with dark rims, borrowed from his sister, a fact admitted by McCoy during an interview. A surveillance camera video shows both a white Toyota Camry four-door sedan, with black rims, and a dark blue Dodge Charger, with dark rims, driving into the neighborhood just minutes before the shooting occurred. Additionally, the Charger was caught on a traffic camera minutes later driving away from the neighborhood.

The jury was presented with sufficient evidence to find beyond a reasonable doubt that McCoy had the requisite intent and motivation to kill or inflict great bodily harm upon Pappillion after Pappillion knocked him out in the bar fight. Pappillion got the best of McCoy at the Hive and McCoy tried on multiple occasions to exact revenge by first shooting at a residence known to be associated with Pappillion, and then later pointing a gun directly at him. These incidents ultimately led up to the tragic death of Sheffield, when McCoy fired shots into a vehicle he believed to be that of Pappillion, a Camry that was nearly identical to the one driven by him.

In light of the multiple incidents involving McCoy and Pappillion, after reviewing the evidence presented in the light most favorable to the prosecution, and excluding every reasonable hypothesis of innocence, we conclude there was sufficient evidence upon which the jury could find

11

beyond a reasonable doubt that McCoy had the specific intent to kill or inflict great bodily harm upon Pappillion. Because of the transferred intent doctrine, McCoy had the specific intent required to be found guilty of second degree murder when he mistakenly shot and killed Sheffield.

This assignment of error is without merit.

*Prieur Motion*

Prior to trial, the trial court granted the state's *Prieur* motion allowing evidence of the March 20 bar fight, the shooting later that night at Cynthia Lane, and the March 31 incident when Pappillion claimed someone he knew as "Trill" pulled a gun on him.

McCoy argues the trial court erred in granting the state's *Prieur* motion and asserts the state could not establish at the hearing he was responsible for, or involved in, these incidents. As such, McCoy maintains no jury could have reached a verdict of guilty in his case without this evidence, and thus his conviction should be set aside based on these errors.

La. C.E. art. 404(B)(1) provides in pertinent part:

> [E]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident.

In *State v. Taylor*, 16-1124 (La. 12/1/16), 217 So. 3d 283, the Louisiana Supreme Court expanded on the seminal case of *State v. Prieur*, 277 So. 2d 126 (La. 1973), and addressed the admissibility of evidence of other crimes, this time in light of the present form of La. C.E. art. 404(B). The *Taylor* court concluded evidence of other crimes may be admissible if the state establishes an independent and relevant reason for its admission

12

but, it noted, the state is still required to provide the defendant with written notice that it intends to use evidence of prior crimes. The *Taylor* court emphasized the evidence must also have substantial relevance independent from a defendant's criminal character, and if the evidence is relevant, it may still be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay, or waste of time, La. C.E. art. 403. Ultimately the *Taylor* court held, when seeking to introduce evidence pursuant to La. C.E. art. 404(B), the state only has to present sufficient evidence to support a finding that the defendant committed the other crime, wrong, or act.

This Court in *State v. Floyd*, 51,869 (La. App. 2 Cir. 6/27/18), 250 So. 3d 1165, *writ denied*, 18-1292 (La. 2/25/19), 266 So. 3d 288, determined a trial court's ruling on the admissibility of other crimes evidence will not be overturned absent an abuse of discretion. The introduction of inadmissible other crimes evidence results in a trial error subject to a harmless error analysis on appeal. *Id.* Further, an error in the admission of evidence of other crimes is not harmless unless a reviewing court determines that the verdict actually rendered was unattributable to the error. *Sullivan v. Louisiana*, 508 U.S. 275, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993); *State v. Brown*, 18-01999 (La. 9/30/21), 330 So. 3d 199, *cert. denied*, 142 S. Ct. 1702, 212 L. Ed. 2d 596 (2022); *State v. Johnson*, 94-1379 (La. 11/27/95), 664 So. 2d 94.

A hearing was held regarding the *Prieur* motion just prior to trial, where Pappillion claimed essentially to remember nothing. However, the body camera video footage of Brandon Bailey, the BPCD officer who

13

responded to the aggravated assault at Pappillion's girlfriend's residence on March 31, was played in its entirety. As previously stated, this footage captured Pappillion informing Ofc. Bailey a man he knew well, though only as "Trill", drove by his girlfriend's apartment and pulled a gun on him. Pappillion also claimed in the video that "Trill" was the person he got into a fight with at the Hive, and who he believed fired shots near his grandmother's house on Cynthia Lane the night following the bar fight. The footage captures a white Toyota Camry four-door sedan, with black rims, parked at the residence. At the hearing, Det. Hampson also testified about his findings from his investigation into the March 20, March 21, and March 31 incidents, as well as the April 10 murder, including references to the bullets and the bullet casings found, the similarities of the automobiles, the statements made, and the images caught on video.

Ultimately, the trial court granted the *Prieur* motion based on its finding the state presented sufficient evidence that McCoy committed these other crimes, wrongs, or acts. The trial court stated it found Pappillion's testimony regarding his lack of memory to be not credible, a finding that is overwhelmingly supported by viewing the videoed statement Pappillion gave to Ofc. Bailey where he was coherent, detailed, and emphatic about what actually happened. The trial court summarized what was seen and heard in the body camera video footage.

As to the shooting of the tire in the early morning hours at Cynthia Lane on March 21, the trial court admitted the evidence was slightly more circumstantial, but the fact the projectiles recovered from the scene were similar to those recovered at the scene of the shooting of Sheffield, coupled with Pappillion's statement to Ofc. Bailey, helped support the conclusion

both were committed by McCoy. The trial court also noted the close proximity in time separating the fight between McCoy and Pappillion at the Hive, and the shooting on Cynthia Lane. Lastly, the trial court emphasized it had concluded each incident was relevant as they showed McCoy had intent and motive to shoot at a Toyota Camry four-door sedan, with dark rims, a vehicle believed to be driven by Pappillion that was virtually identical in appearance to the vehicle Sheffield was driving at the time of her death.

The trial court allowed this evidence to be admitted based on its determination that McCoy's past criminal acts showed he was involved in altercations with Pappillion on multiple occasions. The trial court acknowledged that some of the evidence was circumstantial but, when viewed as a whole, the evidence was sufficient to support McCoy was involved in the March 20 bar fight, and committed both the March 21 shooting on Cynthia Lane and the March 31 aggravated assault of Pappillion.

As we noted in *Floyd*, we cannot overturn the trial court's ruling on this admissibility issue without a clear showing of an abuse of discretion, and we do not find that here. The state offered sufficient evidence of these incidents for the purpose of showing McCoy's motive and intent behind the otherwise unexplained shooting of Hannah Sheffield, not to show McCoy's character. As intent and motive are two of the specific reasons provided in Art. 404(B)(1) for admitting other crimes evidence, the trial court properly accepted the offering. Further, the trial court independently reviewed all of the evidence and concluded it was sufficient, relevant, and credible to show McCoy's intent and motive, an assessment which we agree is supported by

15

the record.  As set forth by the Louisiana Supreme Court in *Taylor,* the state only had to present sufficient evidence to support a finding that the defendant committed the other crime, wrong, or act, a burden they carried in the case.  Lastly, the trial court concluded any prejudicial effect the evidence might have did not outweigh its relevance.

We do not find the trial court abused its discretion in allowing the evidence to be admitted of the March 20 bar fight, the shooting later that evening on Cynthia Lane, or the March 31 aggravated assault.

This assignment of error lacks merit.

### *Motion to Continue*

In his third assignment of error, McCoy argues his oral motion to continue, which was made just prior to jury selection, should have been granted by the trial court.  McCoy claims he discovered just a few days prior to trial, at the *Prieur* hearing, the existence of a possible confession by someone else and that he was prejudiced by not being allowed to investigate this further.

Upon a written motion at any time and after a contradictory hearing, the trial court may grant a continuance, but only upon a showing that such a motion is in the interest of justice.  La. C. Cr. P. art. 707; *State v. Butler*, 53,360 (La. App. 2 Cir. 4/22/20), 293 So. 3d 808, 821, *writ denied*, 20-00798 (La. 11/10/20), 303 So. 3d 1039.  A trial court has discretion to grant a timely filed motion for continuance in any case if there is ground therefor. La. C. Cr. P. art. 712.

Because the decision to grant or deny a motion for continuance rests within the sound discretion of the trial court, a reviewing court will not disturb the trial court's determination absent a clear abuse of discretion.

*State v. Butler, supra*; *State v. Brown*, 52,501 (La. App. 2 Cir. 1/16/19), 264 So. 3d 697, *writ denied*, 19-0297 (La. 6/3/19), 272 So. 3d 892. Generally, a reviewing court will not reverse a conviction even on a showing of an improper denial of a motion for a continuance, absent a showing of specific prejudice. *State v. Manning*, 03-1982 (La. 10/19/04), 885 So. 2d 1044, *cert. denied*, 544 U.S. 967, 125 S. Ct. 1745, 161 L. Ed. 2d 612 (2005); *State v. Saulsberry*, 52,031 (La. App. 2 Cir. 5/23/18), 247 So. 3d 1137, *writ denied*, 18-1067 (La. 11/5/18), 255 So. 3d 1053.

At the *Prieur* hearing, in spite of Pappillion testifying he was impaired most of 2021 and did not remember anything, he claimed that he did remember speaking with an individual named Kirk Jackson a couple of months after the shooting of Sheffield. Pappillion claimed Jackson told him "that's my work," and Pappillion said he believed Jackson was referring to killing Sheffield. Pappillion admitted he rarely talked to Jackson, but did say he has known him his whole life. Pappillion could not be absolutely certain he was speaking to Jackson on the phone, and the person claiming to be Jackson never actually said he had killed Sheffield. Pappillion maintained he was likely impaired during the conversation from smoking marijuana, but still remembered it. He also testified that Jackson's statement, "that's my work," could be interpreted as street talk for killing Sheffield. By the time of trial, Jackson was deceased.

On the day of trial, before jury selection, McCoy orally moved to continue, arguing he needed additional time to investigate Jackson's purported statement to Pappillion. The state pointed out Jackson had been investigated by law enforcement, from a crime stoppers tip, during the course of their investigation and his name was included in all discovery

17

provided to McCoy. Further, there was no evidence, other than Pappillion's questionable statement, that linked Jackson to the murder of Sheffield.

The trial court ultimately denied McCoy's oral motion to continue after summarizing Pappillion's testimony about Jackson in the earlier *Prieur* hearing, and emphasized Pappillion was not even certain Jackson was the person who he spoke to on the phone. The trial court found Pappillion was not credible and noted that McCoy had previously filed a motion for speedy trial, which had been granted by the trial court.

After the motion to continue was denied, the issue of whether Pappillion could testify about this alleged phone conversation he had with Jackson arose. Following a limiting instruction by the trial court, Pappillion was allowed to testify regarding the content of the statement made by Jackson, but he was instructed not to provide his interpretation of what the statement may have meant.

We first note that a written motion to continue was not filed, as is required by Art. 707. As for the merits of whether the motion should have been granted, the trial court had the discretion to deny the continuance and, based upon our review of the record, we find no abuse of the trial court's discretion. The motion was denied only after emphasizing Pappillion's lack of credibility and uncertainty about this possible phone call statement/confession. McCoy asserted he needed more time to investigate the possible confession of Jackson but, as shown above, Jackson was investigated in this matter and was listed on discovery. McCoy had knowledge of Jackson and ample time to conduct his own investigation prior to trial. Significantly, the trial court allowed Pappillion to testify about the statement made by Jackson to him, mitigating any potential prejudice to

18

McCoy in denying the continuance. The record shows Pappillion was questioned in detail about this statement and, therefore, the jury was able to weigh this evidence in reaching its verdict. We find the trial court did not abuse its discretion in denying the motion to continue.

This assignment of error lacks merit.

*Challenges for Cause*

In his final assignment, McCoy argues the trial court erred in denying all four of his challenges for cause. Each juror was ultimately stricken by McCoy using his preemptory challenges.

La. C. Cr. P. art. 797 provides five grounds a defendant may use to challenge a juror for cause:

(1) The juror lacks a qualification required by law;

(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;

(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;

(4) The juror will not accept the law as given to him by the court; or

(5) The juror served on the grand jury that found the indictment, or on a petit jury that once tried the defendant for the same or any other offense.

A trial court is vested with broad discretion in ruling on challenges for cause and its rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. *State v. Tucker*, 13-1631 (La. 9/1/15), 181 So. 3d 590; *State v. Colby*, 51,907 (La. App. 2 Cir. 5/30/18),

244 So. 3d 1260, 1281, *writ denied*, 18-1256 (La. 3/25/19), 267 So. 3d 596. A trial court's refusal to disqualify a prospective juror is not an abuse of discretion or a reversible error if the perceived bias or lack of impartiality of the prospective juror is properly remedied through rehabilitation. *State v. Mickelson*, 12-2539 (La. 9/3/14), 149 So. 3d 178; *State v. Howard*, 98-0064 (La. 4/23/99), 751 So. 2d 783, *cert. denied*, 528 U.S. 974, 120 S. Ct. 420, 145 L. Ed. 2d 328 (1999). A prospective juror can be rehabilitated if the court is satisfied that the juror can render an impartial verdict according to the evidence and instructions given by the court. *State v. Hust*, 51,015 (La. App. 2 Cir. 1/11/17), 214 So. 3d 174, *writ denied*, 17-0352 (La. 11/17/17), 229 So. 3d 928; *State v. Colby*, *supra*.

McCoy argues all four of his challenges for cause were erroneously granted. Upon review, we find no abuse of the trial court's discretion for each challenged juror.

1. James Neal

Neal initially indicated he was not comfortable requiring the state to prove McCoy guilty beyond a reasonable doubt. He stated, "the DA had enough evidence to arrest him in the first place and he is here. I cannot help but feel like he is not innocent." When questioned about this statement, Neal indicated he would try to set aside this presumption and view the evidence fairly. Neal also indicated he had a negative experience with law enforcement in the past and he had close personal friends that currently worked in law enforcement. Despite this, Neal stated he would still weigh all testimony equally. Lastly, Neal shared he did not want the responsibility of possibly sending someone to life in prison; however, Neal went on to say that he would still convict if the state met its burden of proof.

20

McCoy asserted Neal could not be impartial based on these statements. The trial court denied the challenge and pointed out Neal indicated he was comfortable finding someone not guilty and stated he could reach a fair and impartial verdict.

The trial court did not abuse its discretion in keeping Neal on the panel. Neal made three statements which raised concern about his ability to be fair and impartial; however, after each, Neal stated he would view the evidence fairly, weigh the testimony equally, and ultimately convict if the state met its burden of proof. Neal was properly rehabilitated; therefore, the trial court did not error in denying this challenge for cause.

### 2. Charlotte Monk

Monk told the court she knew one of the assistant district attorneys trying the case, but she would not let that affect how she viewed the case or allow it to create any bias. Monk also indicated she was not comfortable sitting on a jury in a murder case and did not know if she could view all of the images presented impartially as she had two cousins who were brutally murdered. In the end, she indicated she believed she could view the evidence impartially and would try to reach a just verdict.

McCoy challenged Monk for cause and argued that because of her statement regarding her family members and what she had been through, she could not be impartial. The trial court articulated it did not get the impression that just because Monk had cousins who were murdered, she would hold that against McCoy. The trial court denied the challenge and pointed to Monk's statement that she would try to be fair and impartial.

We find no abuse of discretion in the trial court's denial of this challenge for cause. Regarding her knowing the assistant district attorney,

Monk specially stated she would not allow the relationship to create any bias. Monk also indicated she would try to reach a just verdict despite her reservations about viewing certain images presented at trial. There is no indication the trial court abused its discretion in finding Monk had been rehabilitated.

### 3. James Lewing

Lewing, who has diminished hearing capabilities, stated twice during initial questioning that he was having trouble hearing and the headset provided by the court was staticky. McCoy lodged a challenge for cause arguing Lewing's hearing issues might lead to his missing important details during trial. The court denied this challenge and opined it did not think being hearing impaired was enough to challenge someone for cause. The court also stated it would have the headset fixed, if required, before testimony was taken.

Lewing was provided a headset by the court and the record supports the trial court, on multiple occasions, went out of its way to ensure the headset was working properly. We find no abuse of discretion in denying this challenge for cause.

### 4. Susan Meyer

Meyer stated during questioning an employee of hers took off work in order to attend Sheffield's memorial and she knew one of the assistant district attorneys trying the case; however, Meyer maintained she could set this aside and it would not affect her decision in any way. The trial court denied McCoy's challenge for cause of Meyer reiterating Meyer's statement that she could make a fair and impartial decision.

Despite her employee's connection to the case and her previous relationship with the assistant district attorney, Meyer assured the court neither one of these would affect her decision making.  Because Meyer was rehabilitated, we find no abuse of discretion in denying this challenge for cause.

Considering the record of the entire voir dire, including each potential juror's answers, we find the trial court did not abuse its discretion in denying McCoy's four challenges for cause.  The trial court, in making its rulings, was able to view each juror's tone and demeanor while delivering their responses.  Thus, it was in the best position to determine if each potential juror had been properly rehabilitated.  We find nothing in the record to suggest an abuse of this discretion.  Accordingly, this assignment of error is without merit.

*Pro se brief*

McCoy submitted an untimely pro se brief in which he reiterates the insufficiency of the evidence claim made by his counsel, and also asserts two new assignments of error.  Both new assigned errors have been thoroughly evaluated and considered by this court.[3]  We find, on the record before us, that these pro se assignments lack merit and do not warrant any further discussion.

---

[3] In his first pro se assignment of error, McCoy argues he was afforded inadequate representation, specifically as it relates to his counsel's failure to object to the state's introduction of alleged hearsay evidence at the *Prieur* hearing.  We find nothing in the record to support this assertion.  Additionally, a claim for ineffective assistance of counsel is more appropriate for post conviction relief.  In his second pro se assignment, McCoy claims his ability to appeal has been impeded by his receiving the record late and given a short time period in which to file his brief.  The record supports McCoy was transmitted a timely briefing notice and the record was transmitted to him.

## CONCLUSION

For the reasons expressed, Demetrious McCoy, Sr.'s conviction and sentence for second degree murder are affirmed.

**AFFIRMED.**